### Appeal of WILSON E. SCHMICK.

Docket No. 1971.    Submitted May 15, 1925.    Decided April 1, 1926.

Gain realized by a stockholder upon the liquidation of the corporation, determined.

*Andrew T. Smith* and *Virgil Y. Moore, Esqs.,* for the taxpayer.
*Ellis W. Manning, Esq.,* for the Commissioner.

Before IVINS, LOVE, and MORRIS.

This appeal is from a determination of a deficiency in income tax for the year 1918 of $49,601.07. The question involved is the gain realized by the taxpayer upon the liquidation of a corporation in which he was the sole stockholder.

### FINDINGS OF FACT.

The taxpayer, a resident of Hamburg, Pa., was engaged in business as an individual in the manufacturing of brooms from 1894 to 1913.

Prior to incorporating the business in 1913 the taxpayer constructed a new building in which to conduct future operations. In the construction of this building the taxpayer was actuated by two motives: (1) The erection of a building adequate for all the needs of the business, and (2) the erection of a building which would stand as a monument to his success and attainments in the broom business. The new building had an area of 218 feet by 60 feet, stood on a sandstone base, was finished in Indiana limestone trim, and in one outer corner of the building a corner stone was placed bearing the inscription "Erected by Wilson E. Schmick 1911–12." The old building in which the business had theretofore been conducted was adequate to the needs of the business, and the efficiency of the operations conducted therein was not exceeded in the new building.

In 1913, the taxpayer organized a corporation under the name of the Hamburg Broom Works, and on October 17, 1913, transferred all of the assets, including the good will, of his broom business to the corporation, and received therefor all of the capital stock of the latter, comprising 1,500 shares of common stock of the par value of $100 each—a total par value for all the stock so issued of $150,000. In addition to this stock consideration, the corporation obligated itself to assume the liabilities of business indebtedness of the taxpayer under the following resolution:

*Resolved,* That as a further consideration of said transfer, this company hereby agrees to assume and pay all the liabilities of business indebtedness of the said Wilson E. Schmick connected with said broom business, and to hold him harmless by reason of any such indebtedness.

Upon taking over the assets and business of the taxpayer, the Hamburg Broom Works determined a net worth in tangible assets of $131,140.01, and so recorded them upon its books of account. The difference between this value of the tangible assets and the par value of the capital stock issued to the taxpayer, to wit, $18,859.99, was charged to good will to balance the accounts.

Further charges were made to the good-will account on the books of the Hamburg Broom Works on the dates and in the amounts set out below:

January 31, 1914_____ $1,000.00
December 24, 1914_____ 23,692.57
December 31, 1915_____ 1,900.00

Total_____ 26,592.57

Thus the total charges against the good-will account on the books of the Hamburg Broom Works amounted to $45,452.56. In 1917 the entire account was charged off on the books against surplus.

On August 1, 1918, the Hamburg Broom Works discounted its own note in the amount of $9,000, due four months from date, with the People's National Bank of Waterville, Me. Because of the pending dissolution of the company, the bank, on September 30, 1918, drew a draft in the sum of $8,925, the balance due on the note, which was accepted and paid by the company on the same date.

Just prior to the dissolution of the Hamburg Broom Works in 1918, taxpayer acquired 50 shares of the capital stock of that company from one Oberholtzer, and 50 additional shares from one Hess, for a total cash consideration of $10,500. Both of these individuals had been employed by the Hamburg Broom Works throughout the whole period of its existence. Oberholtzer was employed in the executive capacity of secretary and treasurer, while Hess, in addition to his duties as factory superintendent, was a director of the company. Both of these individuals were aware of the taxpayer's intention, at the time they parted with their shares of stock, to liquidate and dissolve the Hamburg Broom Works. Neither individual was under any obligation to the taxpayer at the time of these sales of stock to the latter, and the cash consideration paid by the taxpayer for these shares of stock constituted the entire purchase consideration.

On September 30, 1918, the Hamburg Broom Works was placed in process of dissolution, through the distribution on that date of its entire assets to the taxpayer, who was then the sole stockholder. The balance sheet of the corporation on that date, as adjusted by the Commissioner, exhibited the following assets and liabilities:

ASSETS.

Accounts receivable_____ $50,357.35
Notes receivable _____ 500.00
Inventories_____ 116,232.00
Loans and advances to officers_____ 18,151.71
Real estate_____ 5,000.00
Buildings _____ 65,211.96
Machinery_____ 14,277.85
Automobiles_____ 5,782.20
Office furniture and fixtures_____ 1,637.11
Insurance_____ 325.00

Total_____ 277,675.18

104881—27———76

LIABILITIES.

| | |
|---|---:|
| Notes payable | $21, 642. 22 |
| Accounts payable | 23, 460. 35 |
| Mortgage | 3, 500. 00 |
| Cash (overdrawn) | 7, 918. 16 |
| Reserve for depreciation | 8, 551. 12 |
| Capital stock | 150, 000. 00 |
| Surplus | 62, 603. 33 |
| | |
| Total | 277, 675. 18 |

The taxpayer assumed all of the outstanding obligations of the Hamburg Broom Works at the date of dissolution, as shown by the above balance sheet, and in addition thereto that company's liability for income and profits taxes for the nine-month period ended September 30, 1918, in the amount of $47,778.42.

From the very outset, after the distribution to him of the assets of the Hamburg Broom Works, the taxpayer, desiring to retire from business, made very determined but unsuccessful efforts to dispose of the assets so received as a going concern. Advertisements, carrying offers to sell the business and assets, were inserted in trade papers; offers to sell were made to individuals whom it was thought might be interested; delegates attending broomcorn conventions and broom manufacturers' conventions were put on notice that the business as a going concern was on the market for sale; and the taxpayer enlisted the services of one Unger, a public accountant, who periodically examined the books of the business, and one Cox, a broomcorn salesman, to assist him in disposing of the business. No offers to purchase the business as a going concern were ever received.

From September 30, 1918, until in or about the year 1923, the taxpayer continued to operate the business as a sole proprietorship. In 1921 the taxpayer began to dispose of the assets piecemeal, when, on June 14 of that year, by agreement of sale, he disposed of the land and buildings, both the new one constructed in 1911-12 and the old building theretofore utilized, to three individuals engaged in the manufacture of knitted underwear, for a cash consideration of $50,000, which was payable in three installments on dates all within the calendar year 1921. The agreement of sale contained a provision under which the purchasers were to pay to the taxpayer a further sum of $5,000 in consideration of the removal of the broom factory equipment and business from the main building, and a further provision for the leasing of the old building to the taxpayer, for a term of five years, at a stipulated rental of $50 per month. A further provision was contained in the sale agreement in terms as follows:

And the parties of the second part further agree that the tablet stone placed in the corner of the building with the inscription "Erected by Wilson E. Schmick, 1911-12" shall be preserved unchanged as long as the building stands.

The remaining assets of the business were sold in 1923 to a banking syndicate of Philadelphia.

Prior to the organization of the Hamburg Broom Works the taxpayer was also the principal stockholder and an executive officer of the Schmick Handle & Lumber Co. The latter company was engaged principally in manufacturing and furnishing broom handles to the taxpayer and later to the Hamburg Broom Works. In the summer of 1913 he entered into a contract with the Hollingsworth & Whitney Co. under which he agreed to purchase a quantity of logs from the latter company. After the logs were cut, but prior to delivery, the Schmick Handle & Lumber Co. went into bankruptcy. Suit was instituted against the taxpayer in one of the courts of Maine by the Hollingsworth & Whitney Co. to enforce his liability on the contract, but the court held that he had signed the contract for a disclosed principal, which was the Schmick Handle & Lumber Co., and that, in his capacity as agent, he was not liable under the contract. Subsequently, in July, 1918, an action was brought in the District Court of the United States for the Eastern District of Pennsylvania against the taxpayer by the Hollingsworth & Whitney Co., based upon this contract. On November 14, 1923, a jury returned a verdict for the plaintiff and assessed damages in the amount of $15,000. The taxpayer satisfied the judgment on November 16, 1923, by payment in cash of the full amount thereof. In addition thereto, he paid attorneys' fees, during the years 1920, 1922, and 1923, for services in connection with that litigation, in the total amount of $7,775.

Upon audit of the return of this taxpayer for the calendar year 1918, the Commissioner determined that, upon the distribution of the assets of the Hamburg Broom Works, the taxpayer had realized a taxable gain of $77,856.47. Such determination was predicated upon the following computation:

| | |
|---|---:|
| Total value of stock on Sept. 30, 1918 | $258,055.89 |
| Less unpaid income and profits taxes | 47,778.42 |
| Net assets received | 210,277.47 |
| Cost to taxpayer of 1,500 shares of stock | 132,421.00 |
| Liquidating dividend | 77,856.47 |

To the net income as reported in his return for 1918 the Commissioner has added the sum of $77,856.47, as the gain realized by the taxpayer upon the exchange of his stock in the Hamburg Broom Works for the assets of that company, and the deficiency determination is predicated in part upon such action.

The total value of the assets received in liquidation on Septem ber 30, 1918, as included in the Commissioner's computation se out above, represents the book value of the assets as disclosed by th balance sheet of the Hamburg Broom Works of even date, as ad justed by the Commissioner, to which the Commissioner has addec the sum of $45,452.56, being the amount of the good-will accoun written off against surplus in 1917, and deducted the outstandin liabilities as disclosed by the same balance sheet.

The cost to the taxpayer of the 1,500 shares of stock exchangec in 1918 for the assets of the Hamburg Broom Works was $132,421

### OPINION.

MORRIS: This appeal presents for our consideration the question a to the amount of the gain, if any, realized by this taxpayer upoi the liquidation of the Hamburg Broom Works, through which th taxpayer received the entire assets of that company in exchange fo the capital stock owned by him and upon his assuming the outstand ing obligations of the company. The provisions of section 202 (b) of the Revenue Act of 1918 are applicable to the transaction, and thi involves a determination of the fair market value, if any, of th property received by the taxpayer in exchange for his stock, fo only to the extent that such fair market value exceeds the cost of th stock to the taxpayer can the latter be said to have realized a taxabl gain upon the exchange.

As pointed out in our findings of fact, the Commissioner, basin his determination upon a corrected balance sheet of the Hambur Broom Works as of the date of liquidation, has determined that th taxpayer received in exchange for stock, which he had acquired at cost of $132,421, the assets of the dissolved corporation having a ne fair market value of $210,277.47, and that thereby the taxpaye realized a taxable gain of $77,856.47.

On the other hand, the taxpayer contends (1) that the propertie received in liquidation had no fair market value, within the meanin of section 202 (b) of the Revenue Act of 1918; (2) that, if th properties so received can be said to have had a fair market value, a the date received by the taxpayer, then book values are not a criterio thereof; (3) that the fair market value, if any, of the propertie received in liquidation was not in excess of $157,500; and (4) that ii any event the fair market value of the properties received in liquida tion, as established by the Commissioner, should be reduced by th amount included therein as the value of the good will, also by th amount necessary to reduce the real property value included therei to an amount which would be more commensurate with the prope value, also by the total amount of certain liabilities of the Hambur

Broom Works not reflected in the balance sheet of September 30, 1918, nor on the books, which were assumed and paid by the taxpayer.

With the first contention of the taxpayer we feel constrained to disagree. While it may be true to a large extent, and the evidence convinces us that such is the fact, that at September 30, 1918, and for an extended period of time thereafter, there was no market in which a corn-broom manufacturing business might be disposed of as a going concern, nevertheless this is not conclusive proof that the individual assets comprising the plant equipment, real property, stock in trade, raw materials, and accounts receivable had no fair market value. In fact, the preponderance of evidence of record indicates that the plant equipment, real property, stock in trade, and raw materials had a fair market value at the date of distribution, though, in the case of the real property, less than that at which it was carried on the books of the liquidating company. And, with respect to the accounts receivable, it could hardly be said that this asset was without a fair value. At least there is no evidence before us to justify such a conclusion.

With respect to the second contention of the taxpayer, considerable merit is lodged therein, but the principle must necessarily be limited in its application to those instances wherein the proof is ample to demonstrate that book values do not reflect fair market values at the basic date. In the present case the evidence is such as to convince us that the fair market value of the land and buildings received by the taxpayer in liquidation was considerably less than the value at which those assets were carried on the books of the Hamburg Broom Works, a fact which will be given more detailed consideration later on in this opinion. On the other hand, the evidence presented as to the fair market value of the other assets received in liquidation is insufficient to convince us that such value was less than the combined book values of those assets.

The taxpayer's third contention, that the fair market value, if any, of the properties received in liquidation was not in excess of $157,-500, is based upon the proposition that the amount paid by the taxpayer to Oberholtzer and Hess, to wit, $10,500 for 100 shares of the capital stock of the Hamburg Broom Works, just prior to the liquidation of that company, fixes a value for all the stock of that company and by the same token evidences the maximum fair market value of the assets of that company at the date of distribution.

The stock transaction referred to above involved the purchase and sale of but 100 shares, or one-fifteenth of the entire outstanding capital stock of the Hamburg Broom Works. Ordinarily, we would regard the evidence of such transactions as of little consequence when standing alone. However, when we consider the circumstances

surrounding the transactions, through which the taxpayer acquired these shares of stock, in conjunction with other record evidence pertaining to the value of the assets at the date of distribution, we feel convinced that the transactions have considerable weight in establishing the fair market values of the assets received by the taxpayer in liquidation.

As pointed out in our findings of fact, both Oberholtzer and Hess had been employed by the Hamburg Broom Works throughout the period of its corporate existence. Oberholtzer, in his capacity as secretary and treasurer, had an intimate knowledge of the financial condition of the company, as reflected by its books of account, while Hess, through his long association with the company in the capacity of factory superintendent and director, was in a position to know full well the results of the operations of the business. By virtue of these circumstances, both of these individuals knew the value of their stockholdings in the Hamburg Broom Works. Neither was under any obligation whatever to the taxpayer. Both knew, when they parted with their stock, of the taxpayer's intention to dissolve and liquidate the corporation. If either or both had felt that the purchase price was not reasonably equivalent to the full fair value of their stock, they could have elected to await the liquidation of the company, a matter of 30 days hence, to receive their distributive share in the assets of the company. The transactions were conducted at arm's length. When we are confronted with circumstances such as these, we are inclined to ascribe to such transactions considerable weight as evidence of the value of the assets, where the value so indicated is supported by other corroborative evidence.

The fourth contention of the taxpayer is severable into four parts, all of which suggest reasons for a revision downward of the Commissioner's determination of the fair market value of the assets received by the taxpayer in liquidation. The Commissioner determined said value to be $210,277.47, which represents the net book value of the assets, as shown by the balance sheet set out in our findings of fact, plus good will in the amount of $45,452.56, less income and profits taxes of the company for the nine-month period ended September 30, 1918, in the amount of $47,778.42, which were assumed and paid by the taxpayer. The contention takes up first the propriety of the Commissioner's action in increasing the book value of the assets, for the purpose of the determination, by an alleged good will value of $45,452.56.

The story as to how the good will account was arbitrarily written on the books of the Hamburg Broom Works, and as arbitrarily charged off against surplus in the year 1917, is set out in our findings of fact. There we related that the par value of the capital

stock issued to Schmick in 1913 for the assets of his broom business was $18,859.99 in excess of the value of. the tangible assets, the excess being charged to good will account as a mere balancing entry, and later, during the years 1914, 1915, and 1916, further charges were made to this account in the total amount of $26,592.57, bringing the account up to the total sum of $45,452.56. The entire account was charged off against surplus, as worthless, in 1917. The evidence is not at all clear, but rather confusing, as to the nature of the charges made to the good will account in 1914, 1915, and 1916. But it is quite apparent that the good will account was used as a dumping ground, so to speak, for charges which the taxpayer was at a loss to know how to otherwise dispose of.

The facts in the case relating to the Commissioner's determination take a peculiar turn. The Commissioner has held that the cost of the original stock to the taxpayer should be based upon the value of the tangible assets paid in to the company by the taxpayer in 1913. In so doing he disregards the arbitrary charge in 1913 to good will account, on the books of the Hamburg Broom Works in the amount of $18,859.99, as a mere balancing entry. Yet, for the purpose of determining the fair market value of the assets received by the taxpayer in liquidation, the Commissioner includes in his computation a value for good will measured by the sum of the balancing entry made to the good will account in 1913 plus the subsequent arbitrary charges to the same account. Had not these arbitrary charges to the good will account been made, the account would not have appeared upon the books at all; and the Commissioner, predicating his determination of the fair market value of the assets distributed in liquidation upon book values, would have disregarded the good will entirely, or would have resorted to other means to determine its fair market value, if any, when received by the taxpayer. As a matter of fact the Hamburg Broom Works, realizing the error of making these arbitrary charges to good will account and sensing the worthlessness of the account, had eliminated it from the books in 1917, so that no good will appeared in its accounts at the date of liquidation.

In view of the foregoing, we are convinced that the basis used by the Commissioner in his determination of the value of the good will, alleged to have been received by the taxpayer in liquidation of the Hamburg Broom Works, is erroneous, and that, by the same token, the Commissioner's good will valuation of $45,452.56 is erroneous.

Passing on to the proposition as to the fair market value of the real property received in liquidation by the taxpayer, we find that the same was carried on the books of the Hamburg Broom Works at a value of $70,211.96, which the Commissioner adopted as the fair

market value at the date of distribution. We are convinced from the evidence that the value was much less.

The real property in question consisted of the old building in which the taxpayer conducted his business prior to 1912, the new building which he constructed in 1911–12, and the land upon which these buildings stood. The cost of these properties, as shown by the balance sheet in our findings of fact, was $70,211.96, against which some part of the depreciation reserve applied. But viewed in the light of the proven facts in this case, we do not believe that the depreciated cost represented their fair market value at the date of distribution, and especially is this true with respect to the new building constructed in 1911–12.

On the witness stand the taxpayer and other witnesses testified as to the adequacy of the old building to meet the then and prospective needs of the taxpayer's business. They testified that the old building was sufficient in capacity and stability to take care of the growing business, and that the efficiency of the operations conducted therein was never exceeded in the new building. These things are confirmed in a large measure by the fact that, after he sold the real property in 1921, the taxpayer removed his business to the old building, which he had secured under lease, and there conducted the operations of the business until he abandoned it in 1923.

But in the 20 years he had been engaged in the corn-broom manufacturing business prior to 1913, the taxpayer had met with considerable success. From an original plant assembled with $200 of borrowed money, by 1913 the plant had grown to be one of the largest engaged in the corn-broom industry. Proud of his achievements, the taxpayer conceived the idea of erecting a monument testifying to his success and attainments in the corn-broom business. To satisfy his vanity, as the taxpayer himself puts it, he constructed what he proposed should be " the finest broom factory in the country." The building was constructed upon a sandstone foundation, trimmed with Indiana limestone, and in a conspicuous place in the outer wall a corner stone was placed bearing the inscription " Erected by Wilson E. Schmick 1911–12." That the building should be no less a monument to his pride and success after it passed from his possession, a provision was included in the sales agreement " that the tablet stone placed in the corner of the building with the inscription   *   *   *   shall be preserved unchanged as long as the building stands."

However, when the taxpayer sought to dispose of the building through the years 1918 to 1921, he found no ready market for a manufacturing building of this character and type of construction, notwithstanding the taxpayer's determined efforts to so dispose of it. Finally, in 1921, the real property, including this building, was

sold to a concern engaged in the business of manufacturing knitted underwear, at a price of $50,000.

The witness Duvall testified that for the past 20 years he has been engaged in the real estate brokerage business in the vicinity of Hamburg, Pa.; that he is at present assessor for Reading County, in which county Hamburg is located; that for the past 20 years he has been employed by the Pennsylvania Trust Co. to appraise properties upon which mortgages were sought; that he has been employed from time to time by the Reading Railroad Co. to fix damages in the abolition of grade crossings; that he examined the real properties formerly owned by the Hamburg Broom Works; that the fair market value of such properties in 1918 was from $30,000 to $38,000; and that, between the years 1918 and 1921, there was a considerable increase in the value of real property in Hamburg and contiguous territory.

The taxpayer points out that the Commissioner, in his determination of the fair market value of the assets received in liquidation on the basis of book values, failed to take into consideration the liability of the Hamburg Broom Works to the People's National Bank of Waterville, Me., in the sum of $8,925, on a note discounted with that bank on August 1, 1918, which liability was assumed and paid by the taxpayer.

The evidence on this proposition, however, shows conclusively that the bank, on September 30, 1918, drew a draft in the sum of $8,925 on the Hamburg Broom Works, which was accepted and paid the same day by that company; that the taxpayer did not assume this obligation; and that the liquidation of this note was given effect in the balance sheet of the Hamburg Broom Works of September 30, 1918, upon which the Commissioner relied as reflecting book values.

The taxpayer further points out that the Commissioner failed to take into consideration the payment of $15,000 made by the taxpayer to the Hollingsworth & Whitney Co. in 1923, in settlement of damages awarded against him in the same year, by a jury in the United States District Court for the Eastern District of Pennsylvania, in connection with a contract executed by the taxpayer in 1913 for the purchase of a quantity of logs from the Hollingsworth & Whitney Co., as well as the further sum of $7,775, representing attorneys' fees paid during the years 1920, 1922, and 1923, in connection with this litigation. The taxpayer contends that these were obligations assumed by the Hamburg Broom Works when it took over his business in 1913. The evidence before us is not sufficient, however, to convince us that such is the fact.

The liabilities assumed by the Hamburg Broom Works in 1913, as a part consideration for the business of the taxpayer, were solely those representing his business indebtedness—the indebtedness incurred in carrying on his broom manufacturing business. What relation these obligations for damages awarded the Hollingsworth & Whitney Co. and for attorneys' fees bore to his broom manufacturing business has not been disclosed to us. On the record, we doubt that they were connected in any way with the business taken over by the Hamburg Broom Works in 1913.

The facts hereinabove pointed out with respect to the good will and real property values as of September 30, 1918, as determined by the Commissioner, show conclusively that the book values used by him in his computation of the taxpayer's profit on this transaction are considerably in excess of the fair market value of the assets received.

In the light of the facts, as we have found them to be, and in view of the reasons set out in this opinion, we believe that the fair market value of the assets received by the taxpayer in liquidation of the Hamburg Broom Works was not in excess of $157,500, and the computation of the gain should be made on this basis.

*Order of redetermination will be entered on 10 days' notice, under Rule 50.*