GREAT NORTHERN RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 52702, 60319, 69976. Promulgated May 15, 1934.

*F. G. Dorety, Esq., J. P. Plunkett, Esq.,* and *Geo. H. Hess, Esq.,* for the petitioner.

*E. C. Algire, Esq.,* for the respondent.

## OPINION.

LANSDON: The respondent has determined deficiencies for the years 1926, 1927, 1928, 1929, and 1930 in the respective amounts of $149,075.23, $50,144.95, $39,447.45, $84,559.78, and $27,520.98. Several of the allegations of error pleaded by the petitioner have been settled by stipulation or abandonment. The issues remaining for consideration will be stated in connection with the numbered findings of fact and the discussion and decision of each of the submitted questions. The several proceedings have been consolidated for hear-

ing and report. The parties have filed a stipulation, which we accept and incorporate herein by reference.

The petitioner is a Minnesota corporation, with its principal place of business at St. Paul. It is engaged in the transportation of freight and passengers as a common carrier and in auxiliary operations incident thereto, either as a principal or as a 100 percent owner of a group of affiliated concerns for which it reports income as a parent corporation.

*Issue No. 1.—Did the petitioner sustain a deductible loss in 1926 by reason of the liquidation of the Boulevard Transportation Co., an affiliated corporation?*

(1) The Northland Transportation Co. of Minnesota is a corporation organized under the laws of the State of Minnesota. At all times during the year 1926 all of its capital stock was owned by the Northland Transportation Co. of Delaware, all of whose stock in turn was owned by the petitioner. The petitioner filed a consolidated income tax return for the year 1926 on behalf of itself and the Northland Transportation Co. and paid the taxes assessed thereon.

(2) Prior to the year 1926 the Northland Transportation Co. of Minnesota had acquired all of the capital stock of the Boulevard Transportation Co., consisting of 3,951 shares, at a cost of $69.3257 per share, or a total cost of $273,905.93.

(3) The Boulevard Transportation Co. was included in the consolidated income tax return for the year 1926 filed by the petitioner, and the petitioner paid the taxes assessed thereon.

(4) On or about January 25, 1923, the Boulevard Transportation Co. entered into a lease with Charles C. Griswold and Addie K. Griswold, his wife, covering a certain garage property described as Nos. 21, 23, 25, and 27 South Thirteenth Street, in the city of Minneapolis, Minnesota.

(5) Under the terms of the lease a rental of $490 per month was received, payable every three months in advance. It was also agreed that at the termination of the 10-year lease the lessee should purchase the unexpired term of the 100-year ground lease from the lessor and pay therefor the amount of $10,000.

(6) The premises covered by said lease were occupied by a one-story garage building of brick and concrete block construction, approximately 66 feet wide and 158 feet deep, which had been constructed three or four months prior to February 1, 1923. On February 1, 1923, the fair value of the garage building, exclusive of land, was $29,000, and it had a useful life of from 40 to 50 years.

(7) The Boulevard Transportation Co. appraised at $30,000 the value of the garage building on February 1, 1923, computed the

depreciation on the building at the rate of 2½ percent per annum, and determined that it would be worth $22,500 on February 1, 1933, the expiration date of the lease of January 25, 1923. By deducting from the $22,500 the sum of $10,000 required to be paid for the building by the terms of the lease at the expiration thereof, the Boulevard Transportation Co. determined that at the end of the 10-year term it would have an equity of $12,500 in the building, over and above the cash payment of $10,000. In order that the books of the Boulevard Transportation Co. might reflect such equity the sum of $12,500 so determined was divided by 120, the number of months the lease was to run, which produced a figure of $104.16. Out of each monthly rental payment of $490, the sum of $104.16 was charged to the Boulevard Transportation Co.'s capital account and the remainder, $385.84, was charged to income account. During the period from February 1, 1923, to September 17, 1926, the Boulevard Transportation Co. paid the monthly rent reserved in the lease and charged to its capital account out of the rental payments the sum of $3,645.60. During the same period it made capital expenditures on the garage in the amount of $4,792.31.

(8) As of January 1, 1926, all of the property of the Boulevard Transportation Co., except its equity in the garage property covered by the lease, was transferred to the Northland Transportation Co. and all of its liabilities were assumed by the Northland Transportation Co.; which surrendered to the Boulevard Transportation Co. all of the outstanding capital stock of the Boulevard Transportation Co. held by it except 170 shares, which were held as representing the value of the Boulevard Transportation Co.'s equity in the garage retained by it. At the time of the transfer the assets and liabilities of the Boulevard Transportation Co. were carried on its books in the respective amounts of $352,289.18 and $144,289.23.

(9) The Northland Transportation Co. set up the assets and liabilities of the Boulevard Transportation Co. so transferred on its books of account in the amounts carried on the books of the Boulevard Transportation Co. and set up the difference between the net amount so determined and the cost of the stock surrendered, viz., $54,121.64, as intangibles or good will. The net book value of the tangible property received by the Northland Transportation Co. from the liquidation was $207,998.92 and the value of the good will was $54,121.64.

(10) On September 17, 1926, the Boulevard Transportation Co. assigned the lease on the garage property to the Twin City & Southern Bus Co., without consideration, through an intermediary, the Mohawk Stage Lines, Inc.

(11) No part of the capitalized rent or the capital expenditures made on such leased property, aggregating the sum of $8,437.90, was claimed as a deduction in the consolidated income tax return filed by the petitioner for the year 1926.

(12) In December 1926 the Northland Transportation Co. of Minnesota surrendered to the Boulevard Transportation Co. the 170 shares of stock of the latter company which had been retained and wrote off as a loss the pro rata cost thereof, amounting to $11,785.37. The Northland Transportation Co. of Minnesota received no further assets of the Boulevard Transportation Co. in consideration for the surrender of the stock.

(13) On May 6, 1927, the Boulevard Transportation Co. was dissolved by an order of the Circuit Court of the Sixth Judicial Circuit of the State of South Dakota.

(14) In its income tax return for 1926 petitioner claimed a deduction from gross income in the amount of $11,785.37 representing the pro rata cost of 170 shares of stock of the Boulevard Transportation Co. The respondent disallowed this deduction and correspondingly increased the income and tax liability of the petitioner for that year.

On brief the respondent concedes that as a matter of law the petitioner is entitled to deduct a loss resulting from the liquidation of a wholly owned subsidiary within the taxable year if the proof establishes that a loss was, in fact, sustained. The legal question here has been settled. *Burnet* v. *Aluminum Goods Mfg. Co.*, 287 U.S. 544; *Remington-Rand, Inc.* v. *Commissioner*, 33 Fed. (2d) 77; certiorari denied, 280 U.S. 591; *Houghton & Dutton Co.*, 26 B.T.A. 52; *Southwestern Ice & Cold Storage Co.*, 27 B.T.A. 190.

The only evidence as to the amount of the loss is contained in the book entries and balance sheets adduced in evidence. The cost of the stock is stipulated. In the circumstances herein we must either allow or reject the entire loss claimed by the petitioner. The book entries are admissible and competent evidence. *Newton* v. *Consolidated Gas Co.*, 258 U.S. 165; *Cameron* v. *Commissioner*, 56 Fed. (2d) 1021; *Wilson E. Schmick*, 3 B.T.A. 1141. It is quite clear that the loss shown by the evidence herein cannot be more than the actual loss sustained by the petitioner. The assets were written up on the books of the petitioner's affiliate in the amount of $54,121.64 and the reserves for depreciation are certainly small enough. On this issue the respondent is reversed. Since the record shows that no part of the loss sustained by the subsidiary was deducted from its income in 1926 in computing the consolidated income of the group, the entire amount of loss sustained in the liquidation is deductible in that year. Our conclusion, as set out above, makes it unnecessary to discuss or

decide the alternative claim of the petitioner that it is entitled to deduct from its gross income certain losses sustained by the Boulevard Transportation Co. in 1926.

*Issue No. 2.—Loss claimed from retirement of Bluestem–Peach Line.*

(1) During the year 1911, the petitioner projected a line of railroad from Bluestem to Peach, Washington, a distance of 37 miles, surveyed the line, acquired the right of way therefor, and made certain expenditures thereon. The line was never completed or put into operation, and in the year 1927 was retired on authority of the petitioner's board of directors.

(2) During the years 1912 and 1913 petitioner charged as a part of the cost of the construction of said line the sum of $2,299.45 representing taxes assessed against such property. In its excise tax return for the year 1912 and its income tax return for the year 1913 petitioner did not claim such taxes as deductions from its gross income.

(3) During the years 1912 to 1917, inclusive, petitioner charged as a part of the cost of the construction of said line the aggregate sum of $220,162.91, representing interest computed upon the amount of expenditure for the line during the period it was under construction. This amount did not represent any payment for interest by the petitioner, but was simply a book entry whereby investment account was charged and income account credited. In its excise tax return for the year 1912 and its income tax returns for the years 1913 to 1915, inclusive, petitioner reported as a part of its gross income $130,436.56 of the foregoing amount and paid taxes thereon.

(4) In its income tax return for the year 1927 petitioner claimed a loss from the abandonment of said line, which was computed by taking the aggregate sum charged by it for the construction of the line, including the taxes and charges for interest in the aforesaid amounts of $2,299.45 and $220,162.91, respectively, and deducting therefrom the salvage recovered from such abandonment. The Commissioner disallowed as a deduction that part of the loss claimed represented by the taxes paid and interest charged to capital account.

Petitioner contends that under the provisions of section 202 (b) of the Revenue Act of 1926 it is entitled to " proper adjustment for any expenditure or item of loss properly chargeable to capital account " and that the taxes and interest paid or charged as above set out are such expenditures or items. This question has been decided adversely to the contention of the petitioner. *Central Real Estate Co.*, 17 B.T.A. 776; affd., *Central Real Estate Co.* v. *Commissioner*, 47 Fed. (2d) 1036. On this issue the determination of the respondent is affirmed.

*Issue No. 3.—Loss resulting from the liquidation of*
*Northern Steamship Co.*

(1) The St. Paul, Minneapolis & Manitoba Railway Co., hereinafter referred to as Manitoba Co., is a Minnesota corporation. During the year 1926 all its capital stock was owned or controlled by the petitioner, which filed a consolidated income tax return on behalf of itself and the Manitoba Co. for that year and paid the tax assessed thereon.

(2) The Northern Steamship Co. was a corporation organized under the laws of the State of Wisconsin. Prior to its dissolution in 1926 all of its capital stock was owned or controlled by the petitioner and the petitioner filed a consolidated income tax return on behalf of itself and the Northern Steamship Co. and paid the taxes assessed thereon.

(3) On June 18, 1887, James J. Hill, acting for the Manitoba Co., entered into a contract with the Globe Iron Works Co. for the construction of six freight vessels. The Northern Steamship Co. was organized on June 12, 1888, and the contract was assigned to it. Between June 18, 1887, and the date of the organization of the Northern Steamship Co., the Manitoba Co. had made expenditures toward the construction of these freight vessels. Upon its organization the contract was transferred to the Northern Steamship Co. and the amount of the expenditures theretofore made by the Manitoba Co. was charged to the Northern Steamship Co. as advances. On October 8, 1888, the entire capital stock of the Northern Steamship Co. was issued to the Manitoba Co. in payment of the advances theretofore charged to the Northern Steamship Co. and those to be thereafter made. Subsequently, the Manitoba Co. continued to make advances to the Northern Steamship Co. and charged such advances to the cost of the Northern Co.'s capital stock. The Manitoba Co. also issued, on August 1, 1888, collateral trust bonds in the face value of $8,000,000 and sustained discount thereon and incurred expenses in connection with the issuance thereof in the aggregate amount of $2,011,303.75. The Manitoba Co. pledged as collateral for these bonds various securities which it owned, including the capital stock of the Northern Steamship Co. The discount and expenses were allocated to the various securities so pledged and $151,130.15 was allocated to the stock of the Northern Steamship Co. The Manitoba Co. treated this discount and expense so allocated to the stock of the Northern Steamship Co. as a part of the cost of the stock, and this amount plus the advances to the Northern Steamship Co. so charged amounted to $1,488,687.59.

(4) On February 1, 1890, the petitioner acquired from the Manitoba Co. the capital stock of the Northern Steamship Co. and other securities and property pursuant to and in accordance with the

provisions of a resolution adopted by the stockholders of the Manitoba Co. on September 30, 1899, of a resolution adopted by the stockholders of the petitioner on November 11, 1899, and of a lease dated February 1, 1890. The two sets of resolutions and the lease are in evidence and are included herein by reference.

(5) The properties acquired as above set out consisted of some 34 items ranging in value, as reflected on the books of the petitioner at date of acquisition, from $100 to $5,000,000. The stock of the Northern Steamship Co., included in the property so acquired, was taken into the books of the petitioner at the value of $1,500,000. The consideration for the mixed body of assets so acquired was accounted for on its books as a capital item of $19,250,000. It was discharged by the issue of preferred stock of the par value of $10,000,000 and the assumption of $8,000,000 of collateral trust bonds of the Manitoba Co. and of the current obligations of that company in the amount of $1,250,000. The book value on the books of the Manitoba Co. of the various securities and properties so acquired was $11,601,770.17.

(6) On March 31, 1890, two months after the transfer, the Northern Steamship Co. had a credit balance in its profit and loss account of $156,008.04. During the period from February 1 to June 30, 1890, the income of the petitioner from its investment in the capital stock of the Northern Steamship Co. was $120,000, or an equivalent of $8 per share. During the fiscal year ending June 30, 1894, the income of the petitioner from its investment in the stock of the Northern Steamship Co. was $150,000, or an equivalent of $10 per share. The petitioner realized no income from this investment during the fiscal year ended June 30, 1891, 1892, and 1893. The total income realized in the aforesaid amounts spread over the entire period from February 1, 1890, to June 30, 1894, was equivalent to approximately $4.08 per share per year.

(7) During the year 1926 the Northern Steamship Co. was liquidated and its charter surrendered, and all of its capital stock held by the petitioner was surrendered to the Northern Steamship Co.

(8) The petitioner received from the liquidation of the Northern Steamship Co. the sum of $49,225.85.

(9) During the period from 1918 to 1926, inclusive, the petitioner included in its income tax returns as income or deductions the profits and losses of the Northern Steamship Co. as follows:

| Year | Deductions | Income | Year | Deductions | Income |
|---|---|---|---|---|---|
| 1918 | $54,187.90 | | 1924 | | $14.70 |
| 1919 | | $198,248.44 | 1925 | $16,516.24 | |
| 1920 | 496,529.74 | | 1926 | | 6.30 |
| 1921 | 26,871.50 | | | | |
| 1922 | 79.40 | | | 594,253.90 | 198,269.44 |
| 1923 | 69.12 | | | | |

698

(10) The petitioner included in its excess profits tax return for the year 1917, as a deduction, the loss sustained by the Northern Steamship Co. during that year in the sum of $225,030.14. The consolidated excess profits tax group was not subject to excess profits tax for the year 1917, even without the use as a deduction of the loss of the Northern Steamship Co. for that year.

(11) In its income tax return for the year 1926 petitioner did not claim any loss from the liquidation of the Northern Steamship Co., but filed with the Commissioner a claim for refund of the amount of excess tax which it claimed to have paid as a result of the failure to claim such loss in its income tax return. This claim was denied by the Commissioner.

The petitioner's contention as to Issue No. 3 is that it acquired all the stock of the Northern Steamship Co. on February 1, 1890, at a cost of not less than $1,500,000, and that in 1926, through the liquidation of that company, it sustained a loss in the amount of the alleged cost. Counsel for respondent concedes that as a matter of law petitioner is entitled to deduct a loss resulting from the liquidation of a subsidiary affiliated corporation in the taxable year, but contends that petitioner has failed to prove the amount, if any, of the loss claimed. In this situation we must determine the basis for computing the loss claimed in the taxable year. The stock in question was acquired prior to March 1, 1913, and no evidence of its value as of that date has been offered. On brief counsel for respondent argues that omission of proof as to the investment value of the stock in question at March 1, 1913, is fatal to the claim of the petitioner. There is no merit in this argument. The Revenue Act of 1926, which is applicable here, provides at section 204(b) that the basis for determining gain or loss from the sale or other disposition of property acquired prior to March 1, 1913, shall be the cost of the property, or the fair market value at that date, whichever is greater. If the fair market value of the stock of the Northern Steamship Co. at March 1, 1913, was less than cost, petitioner is entitled to use cost as the basis for determining gain or loss from its disposition by liquidation in the taxable year. If such value was greater than cost, petitioner's failure to plead and prove that fact is no more than an omission to claim a greater loss and is not in any way detrimental to the revenues.

The question here involves proof of two facts—(1) the actual consideration paid by the petitioner for the entire body of assets acquired in 1890, and (2) that part of such consideration allocable to the cost of the stock of the Northern Steamship Co. of the par value of $1,500,000. The consideration for the whole body of assets

was in the recited amount of $19,250,000, of which $9,250,000 represented obligations assumed by the petitioner and which we may presume were discharged in cash. The remaining $10,000,000 was paid by the issue of the preferred stock of the petitioner. The record contains no proof of the value of such stock on February 1, 1890. As it was a part of the securities of a great railroad corporation, it is quite certain that it was a listed stock traded in on many stock exchanges throughout the country. We think it was part, at least, of the petitioner's burden to show the market value of such stock at the date it was paid to the Manitoba Co. This could have been done by producing the stock exchange quotations as of the date of the transaction, evidence easily ascertainable by the petitioner. As such evidence was not produced we must presume that it would have been unfavorable to the petitioner's contention as to the value of the stock. There is nothing, therefore, upon which we can base a finding of fact as to its value. Upon this record we must hold that consideration for the assets acquired from the Manitoba Co. has not been proved in excess of $9,250,000.

Even if it be found that the mixed body of assets was acquired by the petitioner on February 1, 1890, at a cost of $9,250,000, there still remains the very difficult task of allocating such cost to each of the various categories included in the purchases, among which was the stock of the Northern Steamship Co. here in question. Counsel for the petitioner suggests five different formulas for the solution of the problem. The several results which he works out vary from $1,337,577.44, the cost of the stock to the Manitoba Co., to $2,470,074.45, arrived at by allocating $19,250,000 among the several properties and groups of securities purchased in proportion to their cost to the Manitoba Co. All of his computations are based upon the assumption, nowhere admitted or proved in the record, that the preferred stock of the petitioner was worth par at February 1, 1890.

In our opinion the first formula suggested by the petitioner produces an approximately correct result. The book value of the whole body of assets purchased in 1890 was $11,601,770.17. The evidence shows that the net return on the stock of the Northern Steamship Co. four years after purchase was a little more than $4 per share, which indicates substantial value at date of acquisition. On such a showing of income it is hardly likely that the stock in question had a fair market value in excess of 75 percent of par. On the facts stipulated we find, therefore, that petitioner paid $1,025,000 for the stock of the Northern Steamship Co. in 1890 and that this amount should be used as the basis for determining the loss resulting from the liquidation of such stock in 1926. In the liquidation petitioner received $49,225.85 and sustained a loss in the amount of

$975,774.15. During the years in which petitioner filed consolidated returns which included the income and deductions of the Northern Steamship Co., that concern sustained losses in the total amount of $594,253.90, which for Federal income tax purposes must be subtracted from the liquidating loss. It follows that petitioner is entitled to deduct the amount of $381,520.25 from its consolidated gross income in the taxable year. *Remington-Rand, Inc.* v. *Commissioner, supra.*

On brief petitioner argues that this loss should not be reduced by the amount of $225,030.14, which was taken as a deduction in its excess profits tax return for 1917. Counsel for respondent admits that this contention is sound and concedes this point. Petitioner also contends that the losses sustained by its subsidiary during the period of affiliation should be offset by the profits realized in such period and only the difference used to reduce the liquidating loss sustained in the taxable year. There is no merit in this claim. The tax liability of a parent corporation is reduced in each of the years in which it deducts a loss of its subsidiary on the consolidated return. The profit realized by such subsidiary in any given year in no way affects the tax liability of the petitioner in such years, since each is a taxpayer and liable for tax on its own profits.

*Issue No. 4.—Loss from liquidation of the Great Northern Steamship Co.*

(1) The Great Northern Steamship Co., hereinafter referred to as the Steamship Co., was a corporation organized under the laws of the State of Minnesota. On or about June 30, 1905, the petitioner acquired all of the capital stock of the Steamship Co. for the sum of $6,000,000 and thereafter, until the time of its dissolution, all of the capital stock of the Steamship Co. was owned or controlled by the petitioner, and the petitioner filed consolidated income and profits tax returns as required by law on behalf of itself and the Steamship Co. and paid the taxes assessed thereon.

(2) Subsequent to June 30, 1905, the petitioner made advances to the Steamship Co. in the sum of $3,459,592.64.

(3) On September 27, 1927, the Steamship Co. was dissolved and the petitioner surrendered to the Steamship Co. all of its capital stock which had theretofore been held by the petitioner.

(4) The petitioner received from the liquidation of the Steamship Co. the sum of $2,931,432.05.

(5) During the period from 1918 to 1927, inclusive, the petitioner included in its income tax returns as income or deductions the profits and losses of the Steamship Co., as follows:

| Year | Deductions | Income |
|---|---|---|
| 1918 | $13,209.05 | |
| 1919 | 4,073.42 | |
| 1920 | | $443.96 |
| 1921 | 110.71 | |
| 1922 | 1,542.88 | |
| 1923 | 56,095.10 | |
| 1924 | | 257.44 |
| 1925 | | 356.04 |
| 1926 | | 62.99 |
| 1927 | | 26.97 |
| | 75,031.16 | 1,147.40 |

(6) The petitioner included in its excess profits tax return for the year 1917, as a deduction, the loss sustained by the Steamship Co. during that year in the sum of $1,626,413.47. The consolidated excess profits tax group was not subject to excess profits tax for the year 1917, even without the use of the deduction of the loss of the Steamship Co. for that year.

(7) In its income tax return for the year 1927 the petitioner did not claim a loss from the liquidation of the Steamship Co., but filed with the Commissioner a claim for refund of the amount of excess taxes which it claimed to have paid as the result of the failure to take such loss in its income tax return. This claim was not acted upon by the Commissioner, and in determining the deficiency for the year 1927 the Commissioner did not allow any loss from the liquidation of the Steamship Co. as a deduction from the petitioner's gross income.

On the facts as above set out the petitioner claims a deductible loss in 1927 in the amount of $6,528,160.59. The respondent concedes that the deduction claimed is allowable as a matter of law, and is at variance with the petitioner only as to the amount of the deductible loss. Under the principle in *Remington-Rand, Inc., supra,* the loss sustained by a parent corporation in the liquidation of a wholly owned subsidiary with which it has been affiliated must be reduced for tax purposes by the amounts of any losses sustained by the subsidiary and used in the computation of consolidated net income during the period of affiliation. The petitioner here claims that such losses for the purposes here should be reduced by the amount of the net gains of the subsidiary during affiliation and should not be increased by the loss sustained in 1917 and used in the computation of excess profits tax liability of the consolidated group for that year. We have settled that question in our discussion and decision of Issue No. 3. The respondent concedes that the petitioner sustained a deductible loss in 1927 in the amount of $6,453,129.43, which he computes by deducting from the total loss sustained in the liquidation the amount of

$75,031.16 representing losses of the subsidiary during the period of affiliation. To the extent conceded by the respondent, the contention of the petitioner as to this issue is granted.

*Issue No. 5.—Loss from the abandonment of the line projected by the Montana Eastern Railway Co.*

(1) The Montana Eastern Railway Co., hereinafter called the Montana Eastern, is a corporation organized under the laws of the State of Montana. At all times during the year 1927 its entire capital stock was owned by the petitioner and the petitioner filed a consolidated income tax return on behalf of itself and the Montana Eastern for that year and paid the taxes assessed thereon.

(2) The Montana Eastern was not and never had been an operating company and never had any income.

(3) During the year 1927 the Montana Eastern abandoned the following uncompleted lines of railway which it had under construction:

> Lewistown, Montana, to Grass Range, Montana.
> Richey, Montana, to Grass Range, Montana.
> New Rockford, North Dakota, to Elbowood, North Dakota.
> Watford, North Dakota, to Elbowood, North Dakota.

These lines had never been operated and no income had ever been derived therefrom.

(4) At the time of such abandonment there had been charged to the construction of the uncompleted lines, exclusive of land, the sum of $4,052,464.98, including in such charge the sum of $1,324,-222.95 representing interest paid to the petitioner and the Director General on borrowed money used for construction purposes, as set forth hereinafter. The salvage recovered upon the abandonment was worth $11,576.60.

(5) In its income tax return for the year 1927 the Montana Eastern claimed as a loss the amount that had been expended in the construction of the lines abandoned, less the salvage recovered upon abandonment and less the said sum of $1,324,222.95.

(6) Of the sum of $1,324,222.95, $867,009.47 represented interest paid to the petitioner during the years 1916 to 1922, inclusive, which was not reported as taxable income by the petitioner, nor was any tax paid thereon; $443,927.88 represented interest paid to petitioner during the years 1910 to 1917, inclusive, which petitioner reported as taxable income in those years and paid taxes thereon; and $13,145.50 represented interest paid to the Director General during the period of Federal control on funds advanced by him for the construction of the lines in question.

(7) In determining the deficiency for the year 1927, the Commissioner allowed the loss claimed by the Montana Eastern in its income tax return and did not allow as a deduction any part of the interest capitalized amounting to $1,324,222.95. Claim for refund of the excess taxes claimed to have been paid was filed by petitioner, but has not been acted upon by the Commissioner.

In the year 1927 the Montana Eastern abandoned uncompleted construction as set out above. At the date of such abandonment the amount of $4,052,464.98 had been charged to construction of the uncompleted lines. This amount was claimed and allowed as a deductible loss in that year except the $1,324,222.95 representing interest which the parties have stipulated was paid to petitioner and the Director General on money borrowed for construction purposes. The petitioner now claims a deduction of such interest in the amount of $457,073.38, which represents the payment to the Director General and the amount reported by the Great Northern Railway as taxable income. We have hereinbefore decided this question in our disposition of Issue No. 2. The determination of the respondent is approved. *Central Real Estate Co.*, *supra*.

*Issue No. 6.—Purchase of half interest in Oregon, California & Eastern Railway Co.*

(1) On June 25, 1927, the petitioner filed with the Interstate Commerce Commission an application for authority to acquire a one-half interest in the capital stock and other obligations of the Oregon, California & Eastern Railway Co. Such authority was granted by the Interstate Commerce Commission on January 24, 1928.

(2) On November 18, 1927, the petitioner executed a written agreement with the Southern Pacific Co. and the Central Railway Co., whereby the Southern Pacific Co. agreed to sell to the petitioner and the petitioner agreed to buy one half of the capital stock of the Oregon, California & Eastern Railway Co. for one half of the cost to the Southern Pacific Co., plus simple interest at the rate of 5 percent per annum. The material portion of the agreement reads as follows:

First: The Pacific Company agrees to sell to the Northern Company, and the Northern Company agrees to purchase from the Pacific Company, one-half of the issued and outstanding capital stock of the O. C. & E., and to pay therefor one-half the cost of all said stock to the Pacific Company, which will be amount paid therefor, plus simple interest at the rate of five per cent per annum, said issued and outstanding stock amounting to $600,000 par value, represented by 6,000 shares of. the par value of $100 each.

\* \* \* \* \* \* \*

\* \* \* It is understood and agreed that the bonds of the O. C. & E., held by the Pacific Company shall be surrendered by the Pacific Company to the

O. C. & E., at cost thereof to the Pacific Company, which cost shall include payments of interest which had accrued on said bonds at time of purchase and was paid by Pacific Company, plus simple interest at rate of five per centum per annum on Pacific Company's investment in said bonds. It is further mutually understood and agreed that all of the debts of the O. C. & E. to the Pacific Company, including advances and values of material and supplies, shall bear simple interest at the rate of five per centum per annum.

\* \* \* \* \* \* \*

Fourth: This agreement is conditioned upon the approval by the Interstate Commerce Commission of the acquisition by Northern Company of one-half of the capital stock of the O. C. & E., and the parties hereto agree to cooperate in securing such approval.

(3) Three hundred thousand dollars par value of the stock of the Oregon, California & Eastern Railway Co. was delivered to the petitioner on March 23, 1928. On that date petitioner paid the Southern Pacific Co. $850,000 to apply on the amount due the Southern Pacific Co. on the contract dated November 18, 1927. On April 30, 1928, petitioner paid the Southern Pacific Co. the sum of $11,229.83 representing the balance due on such contract.

(4) A copy of the bill presented to the petitioner by the Southern Pacific Co. is attached to the stipulation of facts. According to this exhibit the amount of $861,229.83 included principal of $785,912.27, and interest of $71,772.58. Included in the principal was an item of $2,558.44 explained as " Salaries and expenses—S. P. Co. Employees."

(5) Of the sum of $861,229.83 paid by the petitioner to the Southern Pacific Co. the petitioner charged $751,734.94 to its capital account, charged $106,936.45 to its income account as interest, and charged $2,558.44 to its operating expenses account as general expenses.

(6) In its income tax return for the year 1928 petitioner claimed as a deduction the sum of $106,936.45 as interest and $2,558.44 as necessary and ordinary expenses. The Commissioner disallowed these deductions and in the determination of the deficiency increased the taxable income of the petitioner by $109,494.89.

In 1928 the petitioner paid $861,229.83 to the Southern Pacific Co. pursuant to the contract executed on November 18, 1927. In such agreement the purchase price was fixed at cost to the Southern Pacific Co., plus simple interest at the rate of 5 percent per annum. Included in the payments were the amounts of $106,936.45 as interest and $2,558.44 as salaries and expenses of employees of the Southern Pacific Co. Such items were claimed as deductions in the petitioner's income tax return for the year 1928 and disallowed by the respondent. The petitioner now abandons its claim for the deduction of interest paid prior to November 18, 1927, and there remains at issue only the interest paid subsequent thereto in the amount of $13,979.23 and the payment of $2,558.44 to employees of the Southern Pacific Co.

The record is clear that the amount of $2,558.44 was paid to employees of the Southern Pacific Co. and that it was included in the principal amount upon which petitioner paid interest under the contract of purchase. It must be presumed therefore that such payment was in conformity with the contract and part of the consideration provided therein. This conclusion is strongly supported by the fact that petitioner paid interest on the amount and is certainly not entitled to deduct interest on salaries paid to its own employees, even though the services of such persons were loaned to it by another corporation. On this question the determination of the respondent is affirmed. *First Nat. Bank of Omaha*, 17 B.T.A. 1358; affd., 49 Fed. (2d) 70; *Stephens Fuel Co.*, 13 B.T.A. 666.

The agreement provided for the payment of interest to the Southern Pacific Co. on the amount of its cost of the property purchased by the petitioner. Such interest was a part of the consideration, none of which was payable prior to the approval of the contract by the Interstate Commerce Commission. The required approval occurred on March 23, 1928, upon which date a payment of $850,000 was made, followed by a final payment on April 30 of $11,229.83. It is clear therefore that all payments were made as part of the purchase price. The determination of the respondent is affirmed. *Henrietta Mills, Inc.*, 20 B.T.A. 651, affd., 52 Fed. (2d) 931.

*Issue No. 7.—Construction of line from Bend to Chemult, Oregon.*

(1) The Oregon Trunk Railway is a common carrier by railroad, all of the stock of which is owned by the Spokane, Portland & Seattle Railway Co. All of the stock of the latter company in turn is owned half and half by the petitioner and the Northern Pacific Railway Co.

(2) The petitioner desired to extend its line to Klamath Falls, Oregon, in order to reach valuable timberland in that vicinity. To accomplish this it induced the Oregon Trunk Railway to extend its line from Bend to Chemult, Oregon, with the understanding that the petitioner would be given trackage rights over the line. The following resolution was adopted by the board of directors of petitioner on May 15, 1925:

The President stated that the Northern Pacific Railway Company and this Company had decided to have the Oregon Trunk Railway make application to the Interstate Commerce Commission under the provisions of Sub-section 18, of Section 1, of the Act to Regulate Commerce, for a certificate determining the present or future public convenience and necessity require construction and operation by the Oregon Trunk Railway of an extension to its line of railroad from Bend, Oregon, southerly to Klamath Falls.

Upon motion of Mr. Joseph Chapman, duly seconded, it was

RESOLVED that the action of the officers of this Company, for and on its behalf, in joining with the officers of the Northern Pacific Railway Company in caus-

ing and procuring the Oregon Trunk Railway to apply to the Interstate Commerce Commission under the provisions of Sub-section 18 of Section 1, of the Act to Regulate Commerce, for a certificate determining that the present or future public convenience and necessity require construction by the Oregon Trunk Railway of an extension to its line of Railroad from Bend, Oregon, southerly to Klamath Falls, be and the same hereby is approved, notified, confirmed and adopted as and for the act of this Company.

On May 5, 1925, the Oregon Trunk Railway filed with the Interstate Commerce Commission its application for authority to build such a line. On May 3, 1926, the Interstate Commerce Commission entered an order authorizing its construction.

(4) Thereafter the Oregon Trunk Railway made expenditures for the purpose of acquiring the necessary right of way and making necessary surveys of the proposed line.

(5) Thereafter it was determined that the petitioner should build the line instead of the Oregon Trunk Railway, and the petitioner thereupon filed with the Interstate Commerce Commission a petition for leave to intervene in the proceeding and to be substituted for the Oregon Trunk Railway. Such petition was denied on May 11, 1927.

(6) Thereafter, and on June 24, 1927, petitioner filed an application on its own behalf seeking authority to build the line in question. This petition was granted on January 24, 1928.

(7) Thereafter, and during the year 1928, the petitioner reimbursed the Oregon Trunk Railway for the expenditures it had made towards the construction of that line. The payment consisted of $1,140,231.10 representing expenditures made by the Oregon Trunk Railway towards such construction, plus $48,646.59 representing interest at 5 percent per annum on so much of the expenditures as were made prior to November 23, 1927, making the total payment $1,188,877.69. Of the sum of $48,646.59, $14,663.40 represented interest, computed from the date of expenditure to November 23, 1927. The total amount so paid to the Oregon Trunk Railway by petitioner was capitalized by petitioner in its books of account.

(8) In its income tax return for the year 1928 the petitioner claimed as a deduction for interest the sum of $48,646.59 paid to the Oregon Trunk Railway as interest on the expenditures made by that company for the construction of said line. This deduction was disallowed by the Commissioner, and in the determination of the deficiency for the year 1928 the Commissioner increased the taxable income of the petitioner in the amount of $48,646.59.

It is alleged in the petition that respondent erroneously disallowed the deduction of $48,646.59 from petitioner's income in 1928 as interest paid in that year on amounts due the Oregon Trunk Railway as reimbursement of the cost of constructing an extension to its lines. On brief the petitioner abandons a part of its claim, but contends

that the amount of $14,663.40 which represents interest on expenditures between June 1 and November 25, 1927, is deductible as interest accrued and paid in that period. Apparently this contention is based on the theory that on June 1, 1927, the petitioner became obligated to pay all the principal and interest on the cost of construction prior to that date, that the amount of such obligation was the purchase price of the property, and that thereafter all costs incurred by the Oregon Trunk Railway became separate debts due that company, with interest at 5 percent.

The argument of counsel is not convincing. Under the facts it is clear that petitioner undertook to pay the Oregon Trunk Railway for all its construction costs, with interest at 5 percent, regardless of the dates of payments. In these circumstances the whole amount paid must be regarded as cost of the property and no part of such payments is deductible from income. *Henrietta Mills, Inc., supra.* Even if this conclusion is wrong, the petitioner's claim for a deduction in 1928 is not valid. It kept its books on the accrual basis and the amount in question was accruable not later than November 23, 1927, and if interest was allowable as a deduction from income, it was in that year and not in 1928. *United States* v. *Mitchell*, 271 U.S. 9; *Atlantic Coast Line R.R. Co.*, 2 B.T.A. 892. On this issue the determination of the respondent is approved.

*Issue No. 8.—Depreciation on equipment used for construction.*

(1) During the years 1928 to 1930, inclusive, the petitioner charged to its capital account and credited to its operating expense account the following sums, representing depreciation at the rate of 4 percent per annum on its equipment, that accrued during the time that such equipment was being used in the construction of additions to or betterments of petitioner's property:

| | |
|---|---|
| 1928 | $40,161.56 |
| 1929 | 37,273.33 |
| 1930 | 36,624.11 |

(2) In its income tax returns for the years 1928 to 1930, inclusive, the petitioner claimed as deductions from its gross income the full amount of depreciation on equipment sustained during the year, computed at the rate of 4 percent per annum, including depreciation on such equipment during the period that it was used for the construction of additions to or betterments of petitioner's property. The Commissioner reduced the deduction for depreciation by the amounts that had been charged to capital account as afore mentioned, and in the determination of the deficiency for those years the Commissioner increased the taxable income of the petitioner by the amounts set forth.

On their respective briefs counsel for each of the parties argue that the only question here is whether the equipment was used in the petitioner's trade or business. Petitioner contends that it is a part of the regular business of a railroad to construct additional capital facilities for the transaction of its business as a common carrier. Counsel for respondent takes the opposite view, apparently upon the theory that depreciation is allowable only on account of wear and tear of assets used for producing income in a trade or business. This argument is not impressive, since it reads Congressional intent into a statute which is not apparent from the usual meaning of the words used therein. In the deficiency notice the respondent states that the amounts in question are disallowed for the reason that such accounting is analogous to that made for transportation for investment-credit and cites *Great Northern Ry. Co.*, 8 B.T.A. 225, in which we said : " In our opinion, a part of the wear and tear of the train equipment of the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains." There is no citation of this case in respondent's brief, and apparently he no longer regards it as authority for the ruling now under review. In our opinion the equipment employed by the petitioner in its construction work was used by its owner in a trade or business. This satisfies the conditions of the statute. There is no controversy over the rates of depreciation or the nature or use either of the equipment or the capital properties constructed. The determination of the respondent is reversed.

*Issue Nos. 9 and 10.—Additional capital stock taxes paid by petitioner and a subsidiary corporation in 1928 for prior years.*

(1) On or about July 31, 1925, the petitioner filed with the collector of internal revenue at St. Paul, Minnesota, its capital stock tax return for the year ended June 30, 1926, and paid the tax of $199,995 assessed thereon. In the return the fair value of the total capital stock of the petitioner for the year ended June 30, 1926, was reported as $200,000,000. The capital stock tax paid on said return, amounting to $199,995, was claimed as a deduction by the petitioner in its income tax return for the year 1925 and allowed by the Commissioner.

(2) On May 4, 1928, the then Deputy Commissioner of Internal Revenue notified the petitioner that the fair value of petitioner's capital stock as stated in its return had been restated at the sum of $254,500,000 and that there was due from the petitioner an additional tax for the year ended June 30, 1926, in the sum of $54,500.

(3) Thereafter a conference was held in the office of the Commissioner on June 14, 1928, between representatives of the Commissioner

and of the petitioner. After consideration of the information furnished at such conference the Commissioner reduced the additional assessment from $54,500 to $36,000.

(4) On August 9, 1928, the petitioner paid the additional assessment of $36,000.

(5) In computing its income tax return for the year 1928, the petitioner claimed as a deduction the sum of $36,000 additional capital stock taxes paid during that year for the year ended June 30, 1926. The Commissioner disallowed the deduction and in the determination of the deficiency increased the taxable income of the petitioner in the sum of $36,000.

(6) The Somers Lumber Co. is a corporation organized under the laws of the State of Minnesota. At all times during the years 1924, 1925, and 1928 its entire capital stock was owned by the petitioner, and petitioner filed consolidated income tax returns for those years on behalf of itself and the Somers Lumber Co. and paid the taxes assessed thereon.

(7) On or about July 31, 1924, the Somers Lumber Co. filed with the collector of internal revenue at St. Paul, Minnesota, its capital stock tax return for the year ended June 30, 1925, and paid the tax of $1,270 assessed thereon.

(8) On or about July 31, 1925, the Somers Lumber Co. filed with the collector of internal revenue at St. Paul, Minnesota, its capital stock tax return for the year ended June 30, 1926, and paid the tax of $1,062 assessed thereon.

(9) On June 12, 1928, the then Deputy Commissioner of Internal Revenue notified the Somers Lumber Co. that he had increased the assessment of capital stock taxes for the year ended June 30, 1925, from $1,270 to $3,634, an increase of $2,364.

(10) On July 19, 1928, the Somers Lumber Co. paid under protest the additional capital stock tax in the amount of $2,364 assessed for the year ended June 30, 1925.

(11) On or about August 4, 1928, the Somers Lumber Co. filed with the Commissioner a claim for refund of alleged excess capital stock tax paid for the year ended June 30, 1925, in the sum of $1,904. This claim was allowed and paid by the Commissioner on October 13, 1928.

(12) During June 1928 the then Commissioner of Internal Revenue notified the Somers Lumber Co. of an additional assessment of capital stock taxes for the year ended June 30, 1926, in the amount of $628. This assessment was paid July 18, 1928.

(13) In computing its income tax return for the year 1928, petitioner included as a deduction from its gross income the sum of $1,088 representing additional capital stock taxes assessed against

the Somers Lumber Co. for the year ended June 30, 1925, in the amount of $460 and for the year ended June 30, 1926, in the amount of $628. The Commissioner disallowed the deduction and in the determination of the deficiency increased petitioner's taxable income in the amount of $1,088.

The petitioner paid additional capital stock taxes in the year 1928 for the year ended June 30, 1926, in the amount of $36,000. Its wholly owned subsidiary paid additional capital stock taxes in 1928 for the years ended June 30, 1925, and June 30, 1926, in the respective amounts of $460 and $628. Claim is made in each instance for the deduction of the amounts so paid from income in the year 1928. Each corporation keeps its accounts and renders its income tax returns on the accrual basis. The applicable provision of the statute is section 43 of the Revenue Act of 1928.[1]

The whole controversy here hinges on the meaning of the word "accrued." Petitioner argues that only the ordinary bookkeeping meaning could have been intended by Congress, since it is nearly always impossible to determine the exact amount of a tax liability in the year in which it arises under operation of law. He contends, therefore, that additional taxes for any given year cannot be accrued within the intendment of the statute before the year in which they are assessed. The respondent argues that taxes accrue within the meaning of the statute at the date at which liability therefor under the law is established, and in support of his position relies on *Brooklyn Union Gas Co.*, 22 B.T.A. 507; *American Cigar Co.*, 21 B.T.A. 464; *Bowman Hotel Corp.*, 24 B.T.A. 1193; *Pictorial Review Co.*, 26 B.T.A. 472; *United States v. Anderson*, 269 U.S. 422. In our opinion the authorities cited sustain the position of the respondent and his determinations are affirmed.

*Issue No. 11.—Judgment for back taxes paid to the State of Minnesota.*

(1) During the years 1901 to 1907 the Eastern Railway Co. of Minnesota owned and operated a line of railway running from the Mesabi Range in the State of Minnesota to a connection with the railway of the Allouez Bay Dock Co. or its predecessor, the Duluth, Superior & Western Terminal Co., which operated ore docks at Superior, Wisconsin.

(2) On July 1, 1907, this line of railway was sold to the petitioner in exchange for the capital stock of the Eastern Railway Co. of

---

[1] SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.

The deductions and credits provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred", dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period.

Minnesota, which was owned by the petitioner. Since July 1, 1907, this line of railway has been operated by the petitioner.

(3) During the years from 1901 to 1912, inclusive, either the Eastern Railway Co. of Minnesota or the petitioner transported a large quantity of iron ore from the Mesabi Iron Range to Superior, Wisconsin, where it was delivered to the Allouez Bay Dock Co. or its predecessor, the Duluth, Superior & Western Terminal Co., for transportation to said ore docks at Superior.

(4) During the period from January 1, 1901, to December 26, 1911, the published tariff rate for the transportation of this ore from the Mesabi Range to the ore docks at Superior, Wisconsin, was 80 cents per ton, and from December 27, 1911, to December 31, 1912, it was 60 cents per ton.

(5) During the period from January 1, 1901, to July 31, 1909, the Eastern Railway Co. of Minnesota or the petitioner paid to the Allouez Bay Dock Co. or its predecessor, the Duluth, Superior & Western Terminal Co. out of such published tariff rates the sum of 25 cents per ton for the services of the Allouez Bay Dock Co. or its predecessor in the transportation and handling of such iron ore at Superior. During the period from August 1, 1909, to December 25, 1911, the amount paid to the Allouez Bay Dock Co. or its predecessor out of such published tariff rates was 22 cents per ton, and from December 26, 1911, to December 31, 1912, was 15 cents per ton.

(6) In making their gross earnings tax returns to the State of Minnesota pursuant to the tax laws of that state, the Eastern Railway Co. of Minnesota and the petitioner allocated to the State of Minnesota a mileage proportion of the revenue received from the transportation of iron ore from the Mesabi Iron Range in Minnesota to Superior, Wisconsin, after first deducting therefrom the amount paid to the Allouez Bay Dock Co. or its predecessor, the Duluth, Superior & Western Terminal Co., for handling the ore from the connection with that line to the ore docks. The gross earnings taxes assessed on the returns so made were paid to the State of Minnesota.

(7) On or about September 4, 1913, the State of Minnesota made a demand on the petitioner for alleged additional taxes for the years 1901 to 1912, together with interest and penalties thereon, such sum representing the difference between the gross earnings taxes computed upon the total revenue from said iron ore traffic assigned to the State of Minnesota on a mileage basis without deducting therefrom the payments made to the Allouez Bay Dock Co., and its predecessor and the tax that was reported to the State of Minnesota and paid by the petitioner as aforesaid.

(8) This demand not being complied with, the Attorney General of the State of Minnesota filed a complaint in the District Court of Ramsey County, Minnesota, to recover the following amounts of additional taxes, together with interest and penalties: 1901, $5,678.05; 1902, $25,600.59; 1903, $24,463.26; 1904, $25,524.85; 1905, $41,764.10; 1906, $49,656.54; 1907, $60,585.72; 1908, $29,060.80; 1909, $49,617.61; 1910, $60,542.89; 1911, $70,269.89; 1912, $68,094.92; making a total of $510,859.22.

(9) Thereafter, on November 6, 1914, petitioner filed its answer to the complaint, denying that it owed the State of Minnesota the additional taxes demanded and alleging that the attempt of the State of Minnesota to exact from petitioner the additional taxes demanded was unlawful and in contravention of the Constitution of Minnesota and the Federal Constitution, being an attempt to tax interstate commerce; an attempt to tax property outside the state; and an attempt to impose a tax upon petitioner's property higher in proportion to its value than was imposed upon other property in the state.

(10) The case was continued on the calendar on November 9, 1914, and January 19, 1915, after which no action was taken until June 8, 1921, when it was restored to the calendar. On November 15, 1921, petitioner filed an amended answer of the same general tenor as its original answer. On December 7, 1921, the case was tried and submitted and on March 14, 1923, the following judgment was entered by the District Court:

STATE OF MINNESOTA            DISTRICT COURT

COUNTY OF RAMSEY          SECOND JUDICIAL DISTRICT

State of Minnesota,
       Plaintiff,                              116194
           vs.
Great Northern Railway                JUDGMENT
Company, Defendant.

This Court having heretofore, under date of September 30, 1922, after trial of the above entitled action, made and filed its Findings of Fact and Conclusions of Law and Order for Judgment herein, and having, on February 13, 1923, made and filed herein its order amending certain of its said Findings, now, pursuant to said Findings of Fact and Conclusions of Law, and said order amending said Findings of Fact, and pursuant to said Order for Judgment, and upon motion made, IT IS ORDERED, ADJUDGED AND DECREED:

I. That plaintiff, State of Minnesota, have and recover from said defendant, Great Northern Railway Company, the sum of Four hundred seventy-nine thousand five hundred eighty dollars and fifty-eight cents ($479,580.58) taxes and the further sum of Thirteen thousand one hundred eight dollars and fifty-two cents, ($13,108.52) interest on the above amount at the rate of six per cent (6%) per annum from September 30, 1922, to the date hereof.

II. That the application of the State of Minnesota, for judgment against the defendant for and on account of taxes for the year 1901 and for that part

of the year 1902 prior to May 1st thereof, be and the same is hereby denied, and that insofar as omissions of earnings and taxes for said periods are involved herein, this action be and the same hereby is dismissed without prejudice and not in its merits.

III. That the application of the State of Minnesota for judgment against this defendant for taxes assessed on account of earnings for the year 1902, subsequent to May 1, 1902, be and the same is hereby denied, and that insofar as this action involves taxes assessed on the basis of said omitted earnings for said period in the year 1902, the same be and hereby is dismissed without prejudice and not on its merits.

IV. That the application of the State of Minnesota for judgment for penalty and interest on account of any omitted earnings or taxes for the years 1903 to 1912, inclusive, be and the same is hereby denied.

N. C. ROBINSON,<br>
*Clerk of District Court of Ramsey County, Minnesota.*<br>
By G. A. JOHNSON,<br>
*Deputy.*

Dated this 14th day of March, 1923.

Form of the foregoing judgment approved this 14th day of March, 1923.

HUGO O. HANFT,<br>
*Judge of District Court.*

(11) Thereafter an appeal was taken to the Supreme Court of the State of Minnesota, which affirmed the judgment of the District Court and entered a final judgment in favor of the State of Minnesota in the amount of $556,646.32.

(12) Thereafter a writ of error was allowed to the Supreme Court of the United States, which on January 17, 1927, dismissed the writ for want of jurisdiction.

(13) Thereafter the Supreme Court of Minnesota amended its opinion in the proceeding to show that it had considered the Federal question involved therein, such amended opinion being recorded in 174 Minnesota, 3. On March 28, 1928, the Supreme Court of the State of Minnesota entered an amended judgment in favor of the State of Minnesota in the amount of $641,234.85.

(14) Thereafter an appeal was perfected to the Supreme Court of the United States, which on February 18, 1929, affirmed the judgment of the Supreme Court of Minnesota. The judgment of the Supreme Court of the United States was in the following language:

SUPREME COURT OF THE UNITED STATES

No. 107 ——, October Term, 1928.

Great Northern Railway Company, Appellant,
vs.
The State of Minnesota.

APPEAL FROM the Supreme Court of the State of Minnesota.

THIS CAUSE came to be heard on the transcript of the record from the Supreme Court of the State of Minnesota and was argued by counsel.

714

ON CONSIDERATION WHEREOF, It is now here ordered and adjudged by this Court that the judgment of the said Supreme Court, in this cause, be, and the same is hereby affirmed with costs, and interest at the same rate per annum that similar judgments bear in the Courts of the State of Minnesota.

February 18, 1929.

A true copy

Test: CHARLES ELMORE CROPLEY.

Clerk of the Supreme Court of the United States.

(15) On March 27, 1929, the petitioner satisfied the judgment by paying the principal sum of $641,234.85, together with interest thereon from March 23, 1928, to February 26, 1929, amounting to $29,-711.18. At the same time the petitioner satisfied the judgment it paid to the State of Minnesota the sum of $31,278.64 representing back taxes due from the Eastern Railway Co. of Minnesota and the petitioner for the years 1901 and 1902, which under the decision of the case constituted a lawful claim against the petitioner which could at any time be perfected by entering an assessment against the Eastern Railway Co. of Minnesota for which the petitioner would be liable.

(16) The petitioner did not accrue on its books in any year prior to 1929 any of the back taxes included in the judgment of the Supreme Court of Minnesota or in the claim against the Eastern Railway Co. of Minnesota which it paid in conjunction therewith, nor did the petitioner in any year prior to 1929 accrue interest on such back taxes or on the judgment or any part thereof.

(17) In preparing its excise tax return for the year 1909 petitioner deducted from its gross income the taxes accrued on its books for that year. The Commissioner of Internal Revenue corrected the return and allowed as a deduction only the taxes paid during the year. Excise tax returns filed by petitioner for the years 1910, 1911, and 1912 were prepared on the basis of deducting the taxes paid instead of the taxes accrued.

(18) In its income tax return for 1929 petitioner claimed as a deduction the amount paid to the State of Minnesota on said judgment and claim, namely, the sum of $702,224.67. This deduction was disallowed by the Commissioner and in the determination of the deficiency he increased the taxable income of the petitioner in the sum of $702,224.67.

The petitioner contends that it is entitled to deduct the entire payment of $702,224.67 made in 1929 in response to the judgment of the Supreme Court of Minnesota from its gross income as taxes paid or incurred in that year, under the provisions of sections 23 and 43 of the Revenue Act of 1928. In the alternative it claims in any event the right to deduct that part of the entire amount which represents interest accrued on the principal amount of the unpaid taxes. Except as to the interest involved, the question here is iden-

tical with that in Issue No. 10. In conformity with our conclusion therein and the authorities above cited, the determination of the respondent as to the principal of the taxes paid in 1929 in response to the judgment of the court, in the amount of $510,859.22, is affirmed. On brief counsel for respondent concedes that interest in the amount of $191,365.45 is deductible from petitioner's income in 1929 and to that extent, therefore, the determination of the respondent is reversed.

*Issue No. 12.—Loss from liquidation of Skagit Coal & Coke Co.*

(1) The Skagit Coal & Coke Co. was a corporation organized under the laws of the State of Minnesota. In the years 1900 and 1901 the Lake Superior Co., Ltd., acquired all of its outstanding capital stock at a cost of $325,000. This acquisition was held by the Supreme Court of Minnesota to be an acquisition by the petitioner. Thereafter such stock was transferred to the petitioner and owned by it to the date of the dissolution of the Skagit Coal & Coke Co. During the years that consolidated income tax returns were permitted the petitioner filed such returns on behalf of itself and the Skagit Coal & Coke Co. and paid the taxes assessed thereon.

(2) On June 26, 1929, all of the assets of Skagit Coal & Coke Co., with the exception of the current account between it and the petitioner, were sold to the Washington & Great Northern Townsite Co., a subsidiary corporation of the petitioner, at a price of $9,990.72, which represented the amount at which the assets were carried on the books of the Skagit Coal & Coke Co. The assets so transferred consisted of land and coal rights which had been acquired by the Skagit Coal & Coke Co. in part in 1900 and in part in 1915. During the year 1929 the affairs of the Skagit Coal & Coke Co. were liquidated and petitioner received from such liquidation the sum of $159,599.92 and surrendered to the Skagit Coal & Coke Co. all of its outstanding capital stock, which was thereupon canceled. On December 31, 1929, the charter of the Skagit Coal & Coke Co. expired by limitation and was not renewed.

(3) During the period from 1918 to 1929, inclusive, the petitioner included in its income tax returns as income or deductions the profits and losses of the Skagit Coal & Coke Co. as follows:

| Year | Income | Deductions | Year | Income | Deductions |
|---|---|---|---|---|---|
| 1918 | $6,834.98 | | 1927 | | $1,093.81 |
| 1919 | 15,328.17 | | 1928 | | 2,219.32 |
| 1920 | 3,563.92 | | 1929 | | 563.10 |
| 1921 | | $1,166.24 | | | |
| 1922 | | 1,103.57 | | $25,727.07 | 25,260.33 |
| 1923 | | 11,292.90 | | | |
| 1924 | | 2,663.93 | Net income reported for years 1918 to 1929 | 466.74 | |
| 1925 | | 2,626.03 | | | |
| 1926 | | 2,531.43 | | | |

(4) The petitioner included in its excess profits tax return for the year 1917, as a deduction, the loss sustained by the Skagit Coal & Coke Co. during that year in the sum of $8,527.91. The consolidated excess profits tax group was not subject to excess profits tax for the year 1917 even without the use as a deduction of the loss of the Skagit Coal & Coke Co. for that year.

(5) In its income tax return for the year 1929 petitioner did not claim as a deduction any loss from the liquidation of the Skagit Coal & Coke Co., but on September 19, 1932, petitioner filed with the Commissioner a claim for refund of the amount alleged to have been overpaid as taxes for the year 1929 due to its failure to claim said loss as a deduction. The Commissioner denied the claim.

In the circumstances disclosed by the facts, the petitioner claims a deduction in the amount of $165,400.08 from gross income for the year 1929. The record shows that the stock of the Skagit Coal & Coke Co. cost the petitioner $325,000 and that from the liquidation of that company in the taxable year the amount of $159,599.92 was realized. It is the difference between those amounts that is claimed as a deductible loss. Unless the Revenue Act of 1928 precludes the deduction claimed, less losses sustained by the subsidiary during the period of affiliation, such claim must be allowed upon the authorities heretofore cited in the discussion and decision of similar issues herein.

The respondent bases his determination that the loss claimed in the amount of $165,400.08 is not allowable on two grounds—(1) that the evidence does not show that the stock in question cost the petitioner $325,000, and (2) that, under section 141 (b) of the Revenue Act of 1928 [2] and article 37 (a) of Regulations 75,[3] the deduction claimed cannot be allowed even if proof of the basis is convincing.

On brief the respondent argues that the claim must be denied because the stock in question was acquired before March 1, 1913, and no value as of that date has been proved. As we have pointed out in our discussion of the same point under Issue No. 3, the value of the property at March 1, 1913, is not material in the determination of a loss sustained on the disposition of property acquired before that date, if cost of acquisition is proved. It is stipulated that the stock involved was acquired in 1900 and 1901 by the Lake Superior Coal Co., Ltd., at a cost of $325,000 and that the Supreme Court of

---

[2] Sec. 141. (b) *Regulations.*—The Commissioner, with the approval of the Secretary, shall prescribe such regulations as he may deem necessary in order that the tax liability of an affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be determined, computed, assessed, collected, and adjusted in such manner as clearly to reflect the income and to prevent avoidance of tax liability.

[3] Art. 37. (a) *During Consolidated Return Period.*—Gain or loss shall not be recognized upon a distribution during a consolidated return period, by a member of an affiliated group to another member of such group, in cancellation or redemption of all or any portion of its stock; and any such distribution shall be considered an intercompany transaction.

Minnesota, at 117 Minn. 447; 136 N.W. 271, has decided that such acquisition was for the petitioner. Respondent argues that on a question of fact this Board is not bound by the decision of a state court. This is probably true, but it has been held that such a decision is admissible and competent evidence in proof of a fact at issue before a different tribunal. *Koch* v. *Burgess*, 156 N.W. 174. The decision of the Minnesota court is the only evidence on this question and in the absence of rebuttal must be accepted. We find, therefore, that the stock in question cost the petitioner $325,000.

The second point argued by the respondent is that as a matter of law the deduction cannot be allowed. On brief, petitioner relies on *Hernandez* v. *Ilfeld Co.*, 67 Fed. (2d) 236, in which the opinion of the court was to the effect that article 37 (a) of Regulations 75 is not valid because its effect is to deprive taxpayers of a right to which they are entitled under the law. On April 2, 1934, this case was affirmed by the United States Supreme Court as to the result there reached. This affirmation was based on both the nondeductibility of the loss as a matter of law, and the fact that losses sustained by the subsidiaries during the period of affiliation exceeded the losses sustained in the liquidation. On the validity of article 37 (a) the Supreme Court did not agree with the Circuit Court of Appeals, and held that under the regulations no loss is deductible, since the liquidation and distribution occurred within the period of affiliation. On this issue the contention of the petitioner is denied.

In its several petitions the petitioner alleges 39 errors. By stipulations, admissions by the respondent, and abandonment by the petitioner, all questions raised have been settled in the record except the 12 issues heretofore discussed and decided. The recomputation will give effect to the settlement of the questions not submitted to the Board.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH dissents on Issues 5, 7, 9, 10, and 11.