PRODUCERS CHEMICAL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 175–66, 1873–67.    Filed September 26, 1968.

*Leland E. Fiske,* for the petitioner.
*John W. Dierker,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the fiscal years ending March 31, 1962, 1963, 1964, and 1965, in the amounts of $155,141.54, $105,454.16, $40,298.23, and $36,585.91, respectively.

The issues for decision are:

(1) Whether petitioner who purchased a working interest in oil leases with the sellers retaining production payments payable from 85 or 95 percent of the interest conveyed, may deduct all its expenses of producing oil from the leases or is required to capitalize the part of such amounts applicable to producing the oil to be received by the sellers from the retained production payments; and

(2) If a portion of production expenses is not to be deducted but is to be capitalized as a part of the cost of the interest in the leases purchased, are production expenses limited to lifting costs or do they include allocated overhead, depreciation on machinery used in obtaining production, and fracturing costs of existing wells.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a Texas corporation. Its principal office and place of business was in Borger, Tex., at the time of the filing of the petitions in each of these cases. During the years here in issue petitioner was the parent of four subsidiary companies, Katex Oil Co. (hereinafter referred to as Katex), Weatherking Oil Co., Producers Farms, Inc., and Chemical Industries, Inc., all of which had their principal offices and places of business at the same address as petitioner. For the taxable years ended March 31, 1962, March 31, 1963, and March 31, 1964, petitioner and its subsidiaries filed consolidated Federal income tax returns with the district director of internal revenue at Dallas, Tex., and for the year ended March 31, 1965, filed a consolidated Federal income tax return with the district director of internal revenue at Wichita, Kans.

On November 6, 1961, Katex purchased from Charles E. Osgood, Jr., interests in five oil and gas leases located in Hutchinson County, Tex., known as the Coleman, Paul, McCarty, Richards, and Watkins leases for a consideration of $250,000 in cash with the seller retaining a production payment of $500,000 payable from 85 percent of the interest conveyed. The interest conveyed was one-half of the seven-eighths working interest in the Coleman lease and the full seven eighths working interest in the other leases except for certain overriding royalties in two of such leases. The production payment paid

out about November 4, 1962, after which time Katex received the entire working-interest income except for the overriding royalties.

At the time that Katex acquired the Coleman, Paul, McCarty, Richards, and Watkins leases there were 49 producing oil wells and 9 gas injection wells on these properties. The wells had been producing for many years and the production had declined to the point where it was very small, averaging only about three barrels per well per day.

After the above-listed group of leases was acquired, Katex drilled new wells on the properties and rock fractured existing wells for the purpose of increasing production. Since these wells had been drilled open-holed with cable tools, it was possible that all zones open to the well bore could be producing minute quantities of minerals prior to being rock-fractured but it was unlikely that all zones were so producing.

The following income and expense were incurred on the portion of the Coleman, Paul, McCarty, Richards, and Watkins leases, subject to production payments, in the taxable year ended March 31, 1962:

| Lease | Oil and gas income | Intangible drilling costs of new wells | Cost of fracturing old wells | Direct lifting costs | Allocated overhead expense | Depreciation allowed |
|---|---|---|---|---|---|---|
| Coleman (one-half interest) | $6,811.46 | $70,729.33 | $75,435.30 | $10,056.22 | $14,828.76 | $5,355.11 |
| Paul | 1,094.27 | 29,318.31 | 5,876.39 | 1,646.54 | 3,269.07 | 1,368.05 |
| McCarty | 6,947.81 | 32,584.36 | 41,823.26 | 3,726.72 | 7,560.17 | 2,253.16 |
| Richards | 4,685.68 | 41,715.31 | 15,529.63 | 1,710.49 | 5,351.36 | 1,381.56 |
| Watkins | 9,699.90 | 46,378.51 | 60,612.49 | 6,910.34 | 11,119.29 | 3,238.64 |
| Totals | 29,239.12 | 220,725.82 | 199,277.07 | 24,050.31 | 42,128.65 | 13,596.52 |

The following income and expense were incurred on the portion of the Coleman, Paul, McCarty, Richards, and Watkins leases, subject to production payments, in the period from April 1, 1962, to October 31, 1962, on which latter date the production payment paid out:

| Lease | Oil and gas income | Intangible drilling costs of new wells | Cost of fracturing old wells | Direct lifting costs | Allocated overhead expense | Depreciation allowed |
|---|---|---|---|---|---|---|
| Coleman (one-half interest) | $14,914.86 | $331.20 | $19,544.14 | $15,970.42 | $3,552.51 | $7,214.53 |
| Paul | 7,460.26 | | 10,548.75 | 5,049.77 | 1,526.46 | 1,733.83 |
| McCarty | 18,867.70 | 46,318.25 | 12,747.85 | 9,481.05 | 5,403.85 | 5,194.34 |
| Richards | 10,936.78 | 14,898.35 | 6,571.50 | 5,359.66 | 2,115.12 | 2,467.72 |
| Watkins | 16,582.64 | 18,272.73 | 14,132.08 | 11,864.34 | 3,836.01 | 4,846.16 |
| Totals | 68,762.24 | 79,820.53 | 63,544.32 | 47,675.24 | 16,433.95 | 21,456.58 |

The following income and expense were incurred on the portion of the Coleman, Paul, McCarty, Richards, and Watkins leases, subject to production payments, in the entire taxable year ended March 31, 1963;

| Lease | Oil and gas income | Intangible drilling costs of new wells | Cost of fracturing old wells | Direct lifting costs | Allocated overhead expense | Depreciation allowed |
|---|---|---|---|---|---|---|
| Coleman (one-half interest) | $64,409.12 | $331.20 | $25,609.58 | $23,084.83 | $6,090.36 | $12,368.47 |
| Paul | 21,307.68 | | 11,215.25 | 8,562.84 | 2,616.94 | 2,972.45 |
| McCarty | 65,921.30 | 46,318.25 | 13,943.63 | 16,232.90 | 9,264.27 | 8,905.10 |
| Richards | 33,875.03 | 14,898.35 | 7,041.90 | 8,045.53 | 3,626.12 | 4,230.62 |
| Watkins | 68,742.50 | 18,272.73 | 16,557.16 | 18,307.11 | 6,576.39 | 8,308.17 |
| Totals | 254,255.63 | 79,820.53 | 74,367.52 | 74,233.21 | 28,174.08 | 36,784.81 |

The items making up the overhead expense allocated to the above listed group of leases in the taxable year ended March 31, 1962, are as follows:

| Item | Total | Percent allocated | Amount |
|---|---|---|---|
| Office and officers' salaries | $70,236.00 | 45.06341 | $31,650.74 |
| Office supplies | 542.69 | | 244.55 |
| Auto expense | 8,359.13 | | 3,766.92 |
| Testing | 2,225.45 | | 1,002.86 |
| Legal and professional | 6,865.84 | | 3,093.98 |
| Taxes | 2,570.13 | | 1,158.19 |
| Miscellaneous overhead | 3,829.28 | | 1,725.60 |
| Telephone | 106.20 | | 47.86 |
| Subtotal | 94,734.72 | | 42,690.70 |
| Less purchase discounts | 1,247.24 | | 562.05 |
| Net total | 93,487.48 | | 42,128.65 |

The items making up the overhead expense allocated to the above listed leases in the period from April 1, 1962, to October 31, 1962 are as follows:

| Item | Total | Percent allocated | Amount |
|---|---|---|---|
| Office and officers' salaries | $100,400.00 | 12.81036 | $12,861.60 |
| Office supplies | 541.69 | | 69.39 |
| Auto expense | 15,230.70 | | 1,951.11 |
| Advertising | 757.72 | | 97.07 |
| Testing | 3,925.00 | | 502.81 |
| Legal and professional | 7,511.36 | | 962.23 |
| Telephone | 231.80 | | 29.69 |
| Taxes | 561.76 | | 71.96 |
| Utilities | 108.63 | | 13.92 |
| Miscellaneous overhead | 801.75 | | 102.71 |
| Subtotal | 130,070.41 | | 16,662.49 |
| Less purchase discounts | 1,784.00 | | 228.54 |
| Net total | 128,286.41 | | 16,433.95 |

The items making up the overhead expense allocated to the above listed group of leases in the taxable year ended March 31, 1963, are as follows:

| Item | Total | Percent allocated | Amount |
|---|---|---|---|
| Office and officers' salaries | $100, 400. 00 | 21. 96186 | $22, 049. 70 |
| Office supplies | 541. 69 | | 118. 97 |
| Auto expense | 15, 230. 70 | | 3, 344. 95 |
| Advertising | 757. 72 | | 166. 41 |
| Testing | 3, 925. 00 | | 862. 00 |
| Legal and professional | 7, 511. 36 | | 1, 649. 63 |
| Telephone | 231. 80 | | 50. 91 |
| Taxes | 561. 76 | | 123. 37 |
| Utilities | 108. 63 | | 23. 86 |
| Miscellaneous overhead | 801. 75 | | 176. 08 |
| Subtotal | 130, 070. 41 | | 28, 565. 88 |
| Less purchase discounts | 1, 784. 00 | | 391. 80 |
| Net total | 128, 286. 41 | | 28, 174. 08 |

On August 31, 1962, Katex purchased from Panhandle Petroleum Purchasers interests in seven oil and gas leases located in Hutchinson County, Tex., known as the Adams, Allen, Buck, Eller, Grubbs, Jameson, and Roach leases, for a consideration of $100,000 in cash with the seller retaining two production payments, both payable out of 85 percent of the interest conveyed. The first production payment was for $250,000 and was to be paid out first. After payout of the first production payment the second production payment of $226,000 became payable. The interests conveyed were the full working interests except for certain overriding royalties. On the same date Katex executed a deed of trust guaranteeing payment of the second production payment. At March 31, 1965, the first production payment had not yet paid out.

On September 20, 1962, Katex purchased from Production Payment Investors, Inc., an interest in the lease now known as the Jaten Lease, located in Hutchinson County, Tex., for a consideration of $13,000 in cash with the seller retaining a production payment of $35,000 payable out of 95 percent of the interest conveyed. The interest conveyed was the full working interest less a certain overriding royalty. At March 31, 1965, the production payment had not yet paid out.

At the time Katex acquired the Adams, Allen, Buck, Eller, Grubbs, Jameson, Jaten, and Roach leases there were 48 producing oil wells on the properties. The wells had been producing for many years and the production had declined to the point where it was very small.

After acquiring these leases Katex rock-fractured the existing wells for the purpose of increasing production. Four of the 48 producing oil wells on these leases had been drilled open-holed and the possibility existed that all zones on these 4 wells open to the well bore might be producing oil but it was unlikely that all zones were producing prior to the time of being rock-fractured. At the present time when wells are drilled open-holed, rock or sand fracturing is done at the time of drilling to increase the permeability of the formation in which the oil is located. However, at the time the 4 open-holed wells on this property and the 49 oil wells on the Coleman, Paul, McCarty, Richards, and Watkins leases were drilled this procedure was not normally used. Most of these wells had been drilled in the 1930's and the sand- or rock-fracturing procedure now used when wells are drilled open-holed did not become generally prevalent until the early 1950's. Forty-four of the wells on the Adams, Allen, Buck, Eller, Grubbs, Jameson, Jaten, and Roach leases were cased wells. The fracturing work on those wells was done in zones that were not producing because the zones fractured were behind the pipe casings and therefore sealed off. The fracturing work on the cased wells resulted in obtaining production from zones in those wells which had not previously been producing.

Except in one or two instances Katex did not deepen the existing wells on any of the leases which it acquired. The rock-fracturing work done by Katex on all its existing wells resulted in opening up to production new horizons and reserves which had not previously produced.

The following income and expenses were incurred on the Adams, Allen, Buck, Eller, Grubbs, Jameson, Jaten, and Roach leases, subject to production payments, in the taxable year ended March 31, 1963:

| Lease | Oil and gas income | Cost of fracturing old wells | Direct lifting costs | Allocated overhead expense | Depreciation allowed |
|---|---|---|---|---|---|
| Adams | $5,404.82 | $58,856.46 | $9,168.92 | $9,316.25 | $3,810.29 |
| Allen | 538.25 | 13,511.79 | 2,163.40 | 2,121.32 | 1,169.31 |
| Buck | 1,203.19 | 14,869.52 | 2,664.15 | 2,368.66 | 1,259.32 |
| Eller | 1,619.48 | 24,846.40 | 4,376.44 | 3,919.58 | 2,296.14 |
| Grubbs | 876.67 | 10,949.87 | 1,979.93 | 1,792.19 | 1,303.43 |
| Jameson | 2,201.49 | 15,501.45 | 4,310.28 | 2,676.79 | 1,227.13 |
| Jaten | 645.65 | 15,368.01 | 1,320.27 | 2,255.74 | 2,848.48 |
| Roach | 2,811.54 | 33,132.54 | 3,927.79 | 5,021.82 | 2,098.85 |
| Totals | 15,301.09 | 187,036.04 | 29,911.18 | 29,472.35 | 16,012.95 |

The following income and expense were incurred on the Adams, Allen, Buck, Eller, Grubbs, Jameson, Jaten, and Roach leases, subject to production payments, in the taxable year ended March 31, 1964:

| Lease | Oil and gas income | Cost of fracturing old wells | Direct lifting costs | Allocated overhead expense | Depreciation allowed |
|---|---|---|---|---|---|
| Adams | $8, 201. 05 | $2, 394. 06 | $15, 035. 60 | $4, 031. 32 | $6, 692. 72 |
| Allen | 607. 21 | 0 | 2, 337. 84 | 535. 95 | 2, 004. 64 |
| Buck | 1, 643. 24 | (28. 42) | 4, 330. 72 | 992. 82 | 2, 228. 87 |
| Eller | 1, 124. 36 | 4, 426. 31 | 7, 307. 19 | 2, 757. 50 | 3, 936. 46 |
| Grubbs | 1, 482. 57 | 0 | 3, 548. 19 | 813. 42 | 2, 234. 58 |
| Jameson | 2, 439. 71 | 1, 689. 47 | 4, 285. 24 | 1, 405. 27 | 2, 103. 78 |
| Jaten | 766. 97 | 0 | 1, 567. 79 | 359. 42 | 4, 890. 57 |
| Roach | 3, 255. 59 | 4, 162. 21 | 8, 723. 72 | 2, 989. 66 | 6, 830. 69 |
| Totals | 19, 520. 70 | 12, 643. 63 | 47, 136. 29 | 13, 885. 36 | 30, 922. 31 |

The following income and expense were incurred on the Adams, Allen, Buck, Eller, Grubbs, Jameson, Jaten, and Roach leases, subject to production payments, in the taxable year ended March 31, 1965:

| Lease | Oil and gas income | Direct lifting costs | Allocated overhead expense | Depreciation allowed |
|---|---|---|---|---|
| Adams | $5, 161. 94 | $10, 878. 31 | $5, 223. 95 | $6, 840. 87 |
| Allen | 334. 28 | 989. 34 | 475. 44 | 2, 004. 64 |
| Buck | 967. 32 | 4, 195. 95 | 2, 014. 97 | 2, 267. 02 |
| Eller | 361. 64 | 3, 817. 94 | 1, 833. 44 | 3, 980. 31 |
| Grubbs | 979. 53 | 2, 697. 88 | 1, 295. 57 | 2, 258. 67 |
| Jameson | 1, 402. 23 | 3, 829. 03 | 1, 850. 76 | 2, 103. 78 |
| Jaten | 562. 36 | 5, 442. 97 | 2, 613. 81 | 984. 46 |
| Roach | 2, 331. 26 | 8, 678. 69 | 4, 167. 65 | 4, 908. 73 |
| Totals | 12, 100. 56 | 40, 530. 11 | 19, 475. 59 | 25, 348. 48 |

The items making up the overhead expense allocated to the above listed group of leases in the taxable year ended March 31, 1963, are as follows:

| Item | Total | Percent allocated | Amount |
|---|---|---|---|
| Officer and officers' salaries | $100, 400. 00 | 22. 97387 | $23, 065. 77 |
| Office supplies | 541. 69 | | 124. 45 |
| Auto expense | 15, 230. 70 | | 3, 499. 08 |
| Advertising | 757. 72 | | 174. 08 |
| Testing | 3, 925. 00 | | 901. 72 |
| Legal and professional | 7, 511. 36 | | 1, 725. 65 |
| Telephone | 231. 80 | | 53. 25 |
| Taxes | 561. 76 | | 129. 06 |
| Utilities | 108. 63 | | 24. 96 |
| Miscellaneous overhead | 801. 75 | | 184. 19 |
| Subtotal | 130, 070. 41 | | 29, 882. 21 |
| Less purchase discounts | 1, 784. 00 | | 409. 86 |
| Net total | 128, 286. 41 | | 29, 472. 35 |

The items making up the overhead expense allocated to the above group of leases for the taxable year ended March 31, 1964, are as follows:

| Item | United States | Canada | Total | Percent allocated | Amount |
|---|---|---|---|---|---|
| Office payroll___ | $110, 120. 29 | $7, 188. 72 | $117, 309. 01 | 6. 48628 | $7, 608. 91 |
| Contract labor__ | 17, 906. 33 | _____ | 17, 906. 33 | _____ | 1, 161. 46 |
| Travel expense__ | 567. 31 | 784. 10 | 1, 351. 41 | _____ | 87. 68 |
| Office supplies___ | 5, 501. 51 | 218. 95 | 5, 720. 46 | _____ | 371. 06 |
| Auto expense___ | 14, 680. 59 | _____ | 14, 680. 59 | _____ | 952. 24 |
| Miscellaneous overhead_____ | 606. 61 | 87. 58 | 694. 19 | _____ | 45. 04 |
| Gas testing_____ | 4, 200. 00 | _____ | 4, 200. 00 | _____ | 272. 43 |
| Taxes_____ | 1, 695. 91 | 8. 88 | 1, 704. 79 | _____ | 110. 58 |
| Telephone_____ | 341. 36 | _____ | 341. 36 | _____ | 22. 15 |
| Legal and accounting____ | 5, 006. 60 | 267. 28 | 5, 273. 88 | _____ | 342. 08 |
| Rent_____ | 1, 390. 00 | 360. 95 | 1, 750. 95 | _____ | 113. 58 |
| Telephone_____ | | 447. 94 | 447. 94 | _____ | 29. 06 |
| Utilities_____ | | 15. 55 | 15. 55 | _____ | 1. 01 |
| Geological_____ | | 946. 74 | 946. 74 | _____ | 61. 42 |
| Interest_____ | 35, 052. 78 | 6, 676. 72 | 41, 729. 50 | _____ | 2, 706. 66 |
| Totals____ | 197, 069. 29 | 17, 003. 41 | 214, 072. 70 | _____ | 13, 885. 36 |

The items making up the overhead expense allocated to the above group of leases for the taxable year ended March 31, 1965, are as follows:

| Item | Amount | Allocated to leases, 9.5076 percent |
|---|---|---|
| Office payroll_____ | $130, 500. 00 | $12, 407. 41 |
| Contract labor_____ | 4, 984. 52 | 473. 91 |
| Office supplies_____ | 789. 23 | 75. 04 |
| Auto expense_____ | 13, 465. 29 | 1, 280. 23 |
| Utilities_____ | 58. 25 | 5. 54 |
| Insurance_____ | 35. 85 | 3. 41 |
| Currency exchange_____ | 795. 35 | 75. 62 |
| Gas testing_____ | 4, 200. 00 | 399. 32 |
| Taxes_____ | 5, 257. 88 | 499. 90 |
| Telephone_____ | 708. 51 | 67. 36 |
| Legal and accounting_____ | 6, 795. 06 | 646. 05 |
| Rent_____ | 840. 00 | 79. 86 |
| Logs and maps_____ | 3, 527. 22 | 335. 35 |
| Miscellaneous overhead_____ | 130. 43 | 12. 40 |
| Interest_____ | 33, 030. 31 | 3, 140. 39 |
| RAR adjustment_____ | (275. 55) | (26. 20) |
| Total_____ | 204, 842. 35 | 19, 475. 59 |

When Katex acquired the Coleman, Paul, McCarty, Richards, and Watkins leases, subject to production payments, and when it acquired the Adams, Allen, Buck, Eller, Grubbs, Jameson, Jaten, and Roach leases, subject to production payments, it anticipated, at the date

they were acquired, that the current income during the period required for the production payments to pay out would be sufficient to pay direct lifting costs, but that it would not be sufficient to pay either fracturing costs or overhead expense or depreciation.

The method used by Katex to allocate overhead expenses to the various leases here involved was in accordance with the normal accounting procedure used by petitioner and its subsidiaries. An allocation of overhead expenses is made for the purpose of computing depletion on the leases. When Katex acquired the group of leases on November 6, 1961, overhead expenses directly increased by the cost of three contract pumpers and contracted for pickup expenses. For the fiscal year ended March 31, 1962, this direct increase in expenses was in the amount of $6,190 and for the fiscal year ended March 31, 1963, it was in the amount of $3,875.70. When Katex acquired the group of leases it acquired on August 31, 1962, its overhead expenses were directly increased by the cost of one pumper and for pickup on a fixed-fee basis. This direct increase in overhead expenses amounted to $3,455 for the 7 remaining months in the fiscal year ended March 31, 1963, and there was no such direct increase for the fiscal years ended March 31, 1964 and 1965. Katex uses outside help when it is in a busy program of retreating wells or a program of a similar nature in its oil field but uses employees from its parent company at other times. Petitioner and its subsidiary are generally overmanned and are adding leases continually. The consolidated group generally has sufficient supervisory personnel to meet its routine expansion as new leases are acquired.

Petitioner on its consolidated Federal income tax return deducted all expenses incurred on its various leases including the portion of these leases subject to production payments. In making the deduction the cost of fracturing old wells was considered as an expense deduction. Petitioner expensed and deducted its intangible drilling and development costs. Deductions were determined for each lease for direct lifting costs, allocated overhead, and depreciation.

Respondent in his notice of deficiency disallowed the claimed deductions for direct lifting costs, allocated overhead, depreciation, and fracturing applicable to the group of leases here in issue to the extent that these expenses exceeded petitioner's oil and gas income from these leases while the leases were subject to production payments with the following explanation as to the fiscal year ended March 31, 1962:

(a) It is determined that net loss from operations of $322,800.76 on leases listed below are unallowable under internal revenue laws. The said losses are hereby disallowed and capitalized as a part of the cost of the respective leases. Detail is as follows:

| | Coleman | Paul | McCarty | Richards | Watkins | Totals |
|---|---|---|---|---|---|---|
| Expenses: | | | | | | |
| Production | $205,382.89 | $8,913.08 | $55,831.05 | $20,868.26 | $83,660.44 | $374,655.72 |
| Depreciation | 11,160.78 | 1,450.70 | 2,339.78 | 1,448.28 | 3,357.08 | 19,756.62 |
| General | 29,657.52 | 3,269.07 | 7,560.17 | 5,351.36 | 11,119.29 | 56,957.41 |
| Total operating costs | 246,201.19 | 13,632.85 | 65,731.00 | 27,667.90 | 98,136.81 | 451,369.75 |
| Less: | | | | | | |
| Income | 40,304.50 | 1,094.27 | 6,947.81 | 4,685.68 | 9,699.90 | 62,732.16 |
| Intercompany profits | 34,399.86 | 1,390.15 | 10,281.07 | 3,628.14 | 16,137.61 | 65,836.83 |
| Net loss from operations | 171,496.83 | 11,148.43 | 48,502.12 | 19,354.08 | 72,299.30 | 322,800.76 |

Respondent gave the following explanation of the adjustment for the fiscal year ended March 31, 1963:

It is determined that net loss from operations of $247,131.43 on leases listed below are unallowable under internal revenue laws. The said losses are hereby disallowed and capitalized as a part of the cost of the respective leases. Detail is as follows:

| | Adams | Allen | Buck | Eller | Grubbs |
|---|---|---|---|---|---|
| Expenses: | | | | | | |
| Production | | | | | |
| (per return) | $9,168.92 | $2,163.40 | $2,664.15 | $4,376.44 | $1,979.93 |
| (additional) | 67,870.75 | 15,378.62 | 16,923.21 | 28,036.08 | 12,840.40 |
| Depreciation | 3,810.29 | 1,169.31 | 1,259.32 | 2,296.14 | 1,303.43 |
| General | 9,316.25 | 2,121.32 | 2,368.66 | 3,919.58 | 1,792.19 |
| Total operating expense | 90,166.21 | 20,832.65 | 23,215.34 | 38,628.24 | 17,915.95 |
| Less: | | | | | |
| Income | 5,404.82 | 538.25 | 1,203.19 | 1,619.48 | 876.67 |
| Intercompany profits | 9,014.29 | 1,866.83 | 2,053.69 | 3,189.68 | 1,890.53 |
| Net loss from operations | 75,747.10 | 18,427.57 | 19,958.46 | 33,819.08 | 15,148.75 |

| | Jameson | Jaten | Roach | Totals |
|---|---|---|---|---|
| Expenses: | | | | |
| Production | | | | |
| (per return) | $4,310.28 | $1,320.27 | $3,927.79 | $29,911.18 |
| (additional) | 17,825.13 | 17,333.29 | 37,599.56 | 213,807.04 |
| Depreciation | 1,227.13 | 2,848.48 | 2,098.85 | 16,012.95 |
| General | 2,676.79 | 2,255.74 | 5,021.82 | 29,472.35 |
| Total operating expense | 26,039.33 | 23,757.78 | 48,648.02 | 289,203.52 |
| Less: | | | | |
| Income | 2,201.49 | 645.65 | 2,811.54 | 15,301.09 |
| Intercompany profits | 2,323.68 | 1,965.28 | 4,467.02 | 26,771.00 |
| Net loss from operations | 21,514.16 | 21,146.85 | 41,369.46 | 247,131.43 |

It is determined that net loss from operations of $54,541.18 on leases listed below are unallowable under internal revenue laws. The said losses are hereby disallowed and capitalized as a part of the cost of the respective leases. Detail is as follows:

| | Coleman | Paul | McCarty | Richards | Watkins | Totals |
|---|---|---|---|---|---|---|
| Expenses (Apr.–Oct.): | | | | | | |
| Production | $73,253.30 | $17,460.87 | $22,293.91 | $11,931.16 | $27,242.15 | $152,181.39 |
| Depreciation | 14,429.06 | 1,733.83 | 5,194.34 | 2,467.72 | 4,846.16 | 28,671.11 |
| General | 7,105.02 | 1,526.46 | 5,403.85 | 2,115.12 | 3,836.01 | 19,986.46 |
| Total operating expense | 94,787.38 | 20,721.16 | 32,892.10 | 16,514.00 | 35,924.32 | 200,838.96 |
| Less: | | | | | | |
| Income (Apr.–Oct.) | 87,167.61 | 7,460.26 | 18,819.60 | 10,843.01 | 16,560.02 | 140,850.50 |
| Intercompany profits | 2,224.19 | 1,862.35 | 115.01 | 0 | 1,245.73 | 5,447.28 |
| Net loss from operations | 5,395.58 | 11,398.55 | 13,957.49 | 5,670.99 | 18,118.57 | 54,541.18 |

In his deficiency notice for the fiscal years ended March 31, 1964 and 1965, respondent gave the following explanations of his adjustments:

It is determined that net operating losses of $85,066.89 from lease operations for the taxable year ended March 31, 1964, shown in Exhibit B attached are unallowable under internal revenue laws. The said losses are hereby disallowed and capitalized as part of the cost of the respective leases.

It is determined that net operating losses of $73,253.62 from lease operations for the taxable year ended March 31, 1965, shown in Exhibit B attached are unallowable under internal revenue laws. The said losses are hereby disallowed and capitalized as a part of the cost of the respective leases.

Exhibit B attached to the deficiency notice for the fiscal year ended March 31, 1964 and 1965, is a schedule with respect to the Adams, Allen, Buck, Eller, Grubbs, Jaten, Jameson, and Roach leases comparable except as to amounts to the schedule with respect to these leases set forth in the deficiency notice for the fiscal year ended March 31, 1963.

## OPINION

Respondent takes the position that where a taxpayer anticipates at the date he acquires oil and gas leases that his oil and gas income from the leases during the period required for the production payments to pay out will be insufficient to pay the production costs, the excess of the production costs over the oil and gas income received constitutes a part of the cost to the taxpayer of the leases acquired.[1]

After stating his position, respondent in his original brief argues that a part of the production costs of the oil from Katex's leases which are here involved is in payment for the interest petitioner acquired in the properties and therefore is a capital expenditure and is not deductible expense. This is the only argument respondent makes in his original brief with respect to whether some portion of petitioner's production expenses should be capitalized.

Petitioner in its original brief entitled its first argument, "There Is No Statutory Authority for the Capitalization." Petitioner then argues there is no statutory authority for capitalizing as acquisition costs any part of "losses sustained by Katex Oil Company on the production payment leases while the production payments were paying out." In support of the argument, petitioner states that in many cases businesses are started where it is expected that losses will be incurred in the early years which are then expected to be more than offset by

---

[1] Respondent issued a special ruling on May 15, 1956, stating this position. 1956–5 C.C.H. par. 6608. Respondent's position has also been discussed by text writers. See Miller, Oil and Gas, Federal Income Taxation 204–205 (3d ed.), in which the tax advantages of "use of oil payment in producing property acquisition" are discussed and reference is made to the fact that "recent events indicate" that the Internal Revenue Service "will require" in such a transaction if operating costs exceed income from the lease that the purchaser "capitalize the losses as leasehold acquisition costs."

profits in later years but that the "Commissioner has never been successful in capitalizing any of these losses."

Petitioner cites in support of this position *Peerless Stages, Inc.* v. *Commissioner*, 125 F. 2d 869 (C.A. 9, 1942), affirming 43 B.T.A. 111 (1940) ; *Cecil* v. *Commissioner*, 100 F. 2d 896 (C.A. 4, 1939), modifying 37 B.T.A. 904 (1938) ; and *DuPont* v. *United States*, 234 F. Supp. 681 (D. Del. 1964). The last two of these cases dealt with situations where the Commissioner had disallowed the losses sustained in operations which he contended were in the nature of hobbies for the personal pleasure of the taxpayers and not business operations.

*Cecil* v. *Commissioner*, *supra*, dealt with a taxpayer who was the owner of the Biltmore Estate in Buncombe County, N.C., which consisted of 12,000 acres of ground much of which was highly landscaped and on which was situated the Biltmore House and Gardens constructed in the late 1800's by George W. Vanderbilt at a cost of several million dollars. The taxpayer had used the property as her residence for sometime prior to 1930 and after she ceased to so use the property, opened the property to the public for an admission fee of $2, which amount was "estimated as sufficient to defray the expenses of opening the House and Gardens to the public." The Commissioner contended that the operation of the estate was not a "business" within the meaning of the statute permitting deductions of ordinary and necessary expenses paid or incurred in carrying on a business. The issue with respect to deduction of expenses arose by way of amendment to petition. In our opinion (*Cornelia V. Cecil*, 37 B.T.A. 904, 911, (1938)), we stated:

The second issue is whether petitioner is entitled to deduct from her gross income for the year 1931 certain additional expenditures, aggregating $36,309.18, which were incurred and paid during that year as being incident to and necessary in the operation of the Biltmore Estate and the Biltmore House and Gardens. * * *

We pointed out that if these expenses were allowable, they must be allowed as a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business. We further pointed out that the issue was raised by amendment to the petition and that the $36,309.18 in issue was in addition to expenses of $44,460.07 representing salaries, wages, and sundry items of expense which had been incurred and paid in connection with the exhibition of the Biltmore House and Gardens; that the $44,460.07 had been deducted by the taxpayer on her return for the year 1931 and had not been disallowed by respondent; and that the taxpayer reported as part of her gross income the amount of $41,286.73, most of which was received from admissions to the Biltmore Estate and Biltmore House and Gardens and to a small extent from sales of photographs of the estate and house

and gardens. We stated with respect to this issue as follows (37 B.T.A. at 912–913) :

The deductibility of the expenditures aggregating $44,460.07 is likewise not in issue between the parties, although, as will appear later, it is hard to reconcile the respondent's allowance of this item and his refusal to allow the item of $36,309.18. The respondent epitomizes his entire argument by the single statement that the ownership and maintenance of the Biltmore Estate "as a whole" is not a trade or business within the meaning of section 23(a) of the Revenue Act of 1928. In his brief, "Respondent denies that petitioner is entitled to the deduction of $36,309.18 for the reason that the ownership and operation of the Biltmore Estate, exclusive of the Dairy Farms, is not a trade or business within the meaning of Section 23(a), *supra*, and the allocated sum of $36,309.18, or any part thereof, does not qualify as 'ordinary and necessary' expenses paid or incurred during the taxable year 1931 in carrying on any trade or business for profit within the purview of said section." If the only business is the Biltmore Dairy Farms, then it is difficult to find the authority for allowing the $44,460.07 which respondent has allowed as an ordinary and necessary expense paid or incurred during the taxable year. It was stipulated that the $44,460.07 was "incurred and paid in connection with the exhibition of the Biltmore House and Gardens." It was also stipulated that the $36,309.18 was incurred and paid and was incident to and necessary in the operation of the "Biltmore Estate and Biltmore House and Gardens." * * * The respondent in his brief explains the allowance of the $44,460.07 item as follows:

"There is no question but that the receipts amounting to $41,286.73, received from the public for the privilege of visiting the Biltmore Mansion and Gardens are taxable as gross income, as defined by Sec. 22(a), Rev. Act of 1928, 45 Stat. 791, and respondent has reciprocated petitioner's generosity in permitting petitioner to deduct from gross income for 1931 the sum of $44,460.07, made up by specific items of expenses absolutely necessary and incident to opening the mansion and grounds to visitors."

We doubt if there is any material distinction between the expenditures aggregating $44,460.07 and the expenditures in question aggregating $36,309.18. It does not follow, however, that because the respondent has allowed the former we must allow the latter. What he has done in a matter which is not before us does not control our decision in a matter which is before us.

Respondent in the instant case is not contending that petitioner's operations did not constitute a business and therefore the holding of the Fourth Circuit in *Cecil* v. *Commissioner*, *supra*, that the operation of the estate was a business has no relevance to the issue here involved.

The case of *DuPont* v. *United States*, *supra*, dealt with whether an operation of a cattle farm was a trade or business within the meaning of section 165(a), I.R.C. 1954. The issue was whether the operation constituted a trade or business or whether the farm was operated for recreation or pleasure. In that case the court discussed at length whether the taxpayer's intent was to make a profit or whether the making of a profit was secondary to the personal gratification he received from the venture as a recreational or hobby interest. Again, this case is not relevant to the instant case in which the overall profit motive of the petitioner is not in question.

Respondent in his reply brief in the instant case answered petitioner's argument that it should be treated as any other business with the following statement:

Petitioner contends at the outset that its operation should be treated as any other business. It is also contended that other businesses are entitled to deductions for expenses and losses where profits are not anticipated until some future time. Respondent does not disagree with the basic propositions contended in the cases cited on this point. As a matter of fact, respondent is actually attempting to place petitioner on an equal footing with other businesses, which capitalize the cost of acquiring assets. The only difference is that in order to acquire full rights in the oil and gas leases, petitioner had to incur expenses. For this reason, all of the cost incurred in the process of acquiring these full rights must be capitalized. Otherwise, petitioner is not being treated the same as other businesses.

In petitioner's reply brief great reliance is placed on the case of *Peerless Stages, Inc.* v. *Commissioner, supra,* and petitioner quoted at length from our opinion in that case. Petitioner then quoted the following statement of the Ninth Circuit in the *Peerless Stages* case (125 F. 2d at 871):

Where money is expended merely for the purpose of maintaining an existing asset the expenditure constitutes a current business expense, but where money is spent to increase an asset such expenditure constitutes a capital investment. * * *

Petitioner then states that "losses incurred by Petitioner in operating the oil payment leases during the time the oil payments were paying out are deductible as current expenses and are not a cost of the leases acquired."

While the measure of the amount of expenses which respondent determined should be capitalized by petitioner was the excess of production expenses over the income which petitioner received from the oil produced for itself from these leases, our issue here is not whether respondent used the proper method to determine the amount of the expenses of these leases which should be allocated to producing the oil to pay out the production payment. Although from the facts which we have found it is apparent that there might exist some basis for respondent to contend in this case that a higher portion of the expenses than the excess of the expenses over the income petitioner received from the oil should be capitalized, he has not made such a contention. In this case, as in *Cornelia v. Cecil, supra,* we are not concerned with an additional amount which respondent might have contended should be disallowed as a deduction where he has limited his contention and determination to a lesser amount.

Other than the contentions, which we will discuss hereinafter, that overhead, depreciation, and fracturing costs are not properly a part

of production expenses, petitioner has not argued that respondent's allocation of expenses of the production of the oil to pay out the production payments is an erroneous allocation. Since neither party has suggested any other system of allocation of a portion of the expenses of producing oil from the leases here involved to the oil used to pay out the production payment, we will confine our decision in this case to whether the portion of the production costs properly allocable to producing the oil to pay out the production payment should be capitalized and will not consider whether a proper portion of such expenses is properly arrived at by using the excess of production costs over the income from the oil received by petitioner from the leases. The portion of the expenses allocated by respondent's method to the production of the oil to pay out the production payments may or may not result in the proper amount of expenses being allocated to the production of such oil. Since the parties raise no issue in this respect we need not decide this question nor need we decide whether the method of allocation used by respondent is a proper method. Even if we assume respondent's method is completely improper, we nevertheless must hold for him if the amount he allocates to be capitalized is not excessive, and we agree that at least such amount of the costs of production should be capitalized.

We stated in *Cornelia v. Cecil, supra*, after pointing out that it was hard to reconcile respondent's allowance of certain of the expenses with his argument with respect to the balance of the expenses, that the issue with respect to the allowed expenses was not before us. Similarly, in the instant case, since respondent's method of arriving at the portion of the expenses to be allocated to producing the oil to pay out the production payment is not before us, we will confine our consideration to the issue that is before us, namely, whether the portion of the expenses of producing oil allocable to producing the oil to pay out the production payment should be capitalized and not deducted by petitioner as expenses until such time as the production payment has been paid out.

The only case dealing with this issue to which either party refers or which has come to our attention is *Burns* v. *United States*, an unreported case (N.D. Tex. 1965, 16 A.F.T.R. 2d 5015, 65–1 U.S.T.C. par. 9385). In *Burns* v. *United States, supra*, the court upheld without discussion the determination of the Commissioner that the excess of the operating expenses over the taxpayer's oil and gas income from a lease which the taxpayer had purchased with the seller retaining a production payment should be capitalized and not deducted as an expense.

The Supreme Court in *Thomas* v. *Perkins*, 301 U.S. 655 (1937), held that where a contract for sale of an interest in an oil and gas lease pro-

vided for a cash payment plus a specified amount to be paid out of the oil produced from the lease until the stated sum is paid, the seller has retained an economic interest in the oil and gas in place. The fact that the seller retained an economic interest in the oil and gas caused the income from such oil and gas to be taxable to him and entitled him to depletion deductions with respect to that income.

Respondent in the instant case specifically recognizes that in accordance with the holding of the Supreme Court in *Thomas* v. *Perkins*, *supra*, no portion of the income from the receipts from the oil which goes to the seller to pay out the production payment is taxable to petitioner. In *Thomas* v. *Perkins*, *supra*, the reserved production payment was to be paid out of one-fourth of the oil produced from the lease until the sum was paid in full. In the instant case the portion of the production to go to the seller was 85 percent with respect to all of the leases except one and 95 percent with respect to one lease. While we see no difference in principle between a part of the cost of production being costs of production of the oil used to pay out the retained production payment, where the retained payment is to be paid out of 25 percent of production and where it is to be paid out of 85 to 95 percent of production, the fact that some portion of the expenses of producing the oil is attributable to the oil used to pay out the production payment becomes more apparent where the production payment is from such a high portion of the total production. If 99 percent, or perhaps 100 percent, of the oil produced from a lease was to be used for the payout until the production payment retained by the seller had been paid in full, the total expense of producing oil from the lease would be expense necessary to pay the seller for the property purchased. Such expenditures would clearly be money spent to acquire an asset. Under such circumstances until the production payment was paid out, the money used in producing the oil would be spent for no purpose other than the acquiring of an asset. If we would consider that what the purchaser actually paid for the lease was the cash plus the costs necessary to produce the oil which goes to the seller until the production payment is paid out where total production goes to the seller for the period required for the production payment to pay out, it follows that where only a part of the oil is used to pay out the production payment, the portion of the production costs properly allocable to producing the oil to pay out the production payment should be considered to be in substance an additional payment for the purchased interest in the lease.

From the standpoint of the purchaser what is acquired, using for simplicity the situation of 100 percent of production going to the seller until the payout is completed, is a right to a portion of the pro-

duction from the lease after the payout period, and what he must pay to obtain his interest is a cash payment plus the amount it costs him to produce the oil to pay out the production payment. Taking this view of the transaction, the cost of production of the oil is not different from any other cost incurred by a taxpayer as part of the cost of a capital investment. See *Fall River Gas Appliance Co.*, 42 T.C. 850, 856–857 (1964), affd. 349 F. 2d 515 (C.A. 1, 1965), which holds that installation costs of leased appliances are capital expenditures and not deductible as business expenses.

Petitioner's contention that there is no statutory authority for capitalizing losses suffered by an oil producer during the period of payout of retained production payments, misconstrues respondent's contention. In effect respondent's position is that the claimed deduction by petitioner for costs of producing the oil and gas used to pay out the production payment is not allowable. It is incumbent on petitioner to show that this claimed deduction is properly allowable as an ordinary and necessary business expense under section 162, I.R.C. 1954. The method which respondent uses to measure the deduction of the cost of producing the oil and gas used to pay out the production payment is to offset against total production costs of oil and gas from the leases involved the oil and gas income derived by petitioner from those leases. Petitioner does not contend that this method of determining the amount of the production costs which is allocable to the oil produced to pay out the production payment is an incorrect method of allocation, but merely contends that no portion of the cost of producing the oil should be allocated to the oil used to pay out the production payment.

The case of *Peerless Stages, Inc.*, 43 B.T.A. 111 (1940), affd. 125 F. 2d 869 (C.A. 9, 1942), on which petitioner relies, points out that where expenditures are not attributable to current operations but are attributable to the acquisition of an asset, the taxpayer is not permitted to deduct the expenditures as business expenses but is required to charge them to "capital account." The fact that an expenditure is designated by a taxpayer as an expense does not justify its deduction if in actuality it is paid as a part of the purchase price of an asset. See *Herbert Shainberg*, 33 T.C. 241, 249–251 (1959), requiring that such items as sales tax and accounting fees applicable to a shopping center under construction be capitalized and not deducted as a business expense and *Berkshire Oil Co.*, 9 T.C. 903, 907–908 (1947), and cases there cited, holding that costs of drilling oil wells which were required to be drilled by the contracts as part of the consideration for the acquisition of an interest in a lease are not deductible as development costs but must be capitalized as a part of the cost of the interest in the lease

which the taxpayer-driller acquired.[2] These cases recognize the long-standing rule that payments made, whether by cash, property, expenditures for labor and materials, or in some other manner, for a capital interest are not deductible as "ordinary and necessary business expenses" but must be capitalized as part of the cost of the asset so acquired. Our question here is whether any part of the production expenses paid by petitioner is part of the purchase price of the leases. The only case directly on the point has held that such a payment was a part of the purchase price of the leases. *Burns* v. *United States, supra.* When a taxpayer acquires leases subject to a production payment in substance he pays for the interest in the leases acquired by paying the production costs to produce the oil to pay out the production payment in addition to the cash payment. We hold that respondent is correct that a part of the cost of producing oil from the leases here involved while the production payment retained by the seller is being paid out is an additional cost to the petitioner of acquiring his interest in the leases. Capital investments, unless otherwise provided by statute, are not deductible but must be recovered, either through depreciation, depletion, or the sale of the asset.

Having concluded that respondent is correct in considering a part of production costs to be a cost of the property acquired, it is necessary for us to consider the question of whether, as petitioner contends, the only expense which should be considered in determining whether the oil and gas income from the leases is sufficient to pay the expenses of production is the direct lifting cost, or whether, as respondent contends, a portion of the overhead expenses, depreciation, and fracturing costs should also be considered as production expenses.

Petitioner argues that allocated overhead expenses and depreciation as well as fracturing costs should not be considered as a part of the costs of production from the various leases. Petitioner's argument with respect to overhead expenses is that, except to a relatively minor extent, its overhead would have been the same whether or not the leases here involved had been acquired. One of petitioner's witnesses in effect made this statement in his testimony. However, other testimony of this same witness in substance contradicts this statement. The witness testified that petitioner and its various subsidiaries constantly remained "overmanned" and added leases all of the time. The clear inference from this testimony is that petitioner and its subsidiaries anticipated acquiring additional leases on a regular and continuing basis and kept manpower available to operate the added leases. Sometimes, as was the situation here, petitioner would acquire such a number of additional

---

[2] We recognize that because of changes in the statute and in respondent's regulations, these costs are now handled in a different manner. However, the general principles of law as to what constitutes a capital expenditure discussed in these cases were not changed.

leases that it would be necessary for it to add workers whose wages were charged to overhead on a temporary basis specifically for work on the newly acquired leases. However, as a general matter petitioner kept the manpower for additional leases it might acquire and expected to and did regularly acquire new leases. Each lease was expected to and did require for its operation a proportionate part of petitioner's overhead expenses.

In *Ben Perlmutter*, 44 T.C. 382, 403–404 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967), which involved a question of allocation of overhead expenses to the cost of a shopping-center building constructed by the taxpayer and retained by him for rental purposes, we pointed out that the taxpayer's argument tacitly admitted that some portion of overhead expenses should be allocated to the shopping-center building and concluded that the taxpayer had not shown error in respondent's allocation.

In the instant case petitioner argues that the overhead expenses allocable to the leases which are involved in this case should be limited to the increases of $6,190 for the fiscal year 1962 and $3,875.70 plus $3,403.55 for the fiscal year 1963 which its witness testified were the direct increases in overhead expenses caused by acquisition of the leases here involved.

In the instant case there is an allocation on petitioner's books of a portion of the overhead expenses to these leases. Petitioner contends that this allocation was necessary for the purpose of computing depletion and should not be considered as a production cost of the leases for any other purpose. However, the evidence shows that costs in addition to the amounts petitioner admits were added overhead on the leases here involved were charged to overhead for necessary work performed in the production of oil and gas from the leases here involved. Here, as in *Ben Perlmutter, supra*, petitioner has not shown, nor does it contend for, an allocation different from that determined by respondent should we conclude that an allocable portion of overhead expenses is part of production costs. Under the facts here shown we conclude that the allocated overhead expense on the leases here involved is a part of the cost of production of oil and gas from those leases. The function performed for which the expense was incurred was necessary to produce oil from the leases.

Petitioner argues that depreciation is not an expense, citing *Maurice S. Gordon*, 37 T.C. 986 (1962), and that, therefore, no depreciation should be included in the cost of production of the leases here involved. Petitioner further argues that depreciation can never be capitalized. Petitioner states that since the equipment was being used by Katex in the production of oil and gas from its leases, all of the depreciation is currently deductible, citing *Great Northern Railway*

*Co.*, 30 B.T.A. 691 (1934). The facts here show that petitioner used machinery in connection with the production on the leases here involved and incurred depreciation on that machinery. The question is whether this expense is part of operating costs.

The case of *Maurice S. Gordon, supra,* cited by petitioner for the proposition that depreciation is not an expense, involved a claimed medical deduction for transportation expense including depreciation claimed on an automobile. We held that the deduction for medical expenses was for such expenses paid in the year for which the deduction was claimed and concluded that depreciation was not an expense paid in the year in issue. That case has no relevance to the issue in the instant case.

Depreciation on machinery used in a trade or business is an allowable deduction in computing a taxpayer's income from that trade or business. This is the holding of *Great Northern Railway Co., supra.* If machinery is used to construct a capital improvement such as a new building, respondent takes the position that depreciation on such equipment is a part of the cost of the capital improvement and not deductible. Sec. 263(a)(1), I.R.C. 1954. See Rev. Rul. 59–380, 1959–2 C.B. 87. Respondent in his ruling relies on *New Quincy Mining Co.*, 36 B.T.A. 376 (1937), in which we held depreciation on the taxpayer's equipment used during the developmental stage of an ore mine to be part of the development costs of that mine. Respondent in the instant case takes the position that it was necessary for petitioner to use the equipment, depreciation of which was allocated to the leases here involved, to produce the oil to pay off the production payment. Respondent contends that it follows that such depreciation should be treated as any other cost of production from these leases. We agree with respondent that depreciation on the equipment used in connection with production from the leases here involved should be considered as a part of the cost of production from those leases.

The *Great Northern Railway Co.* case cited by petitioner involved a claimed deduction for depreciation on certain equipment which was used in the taxpayer's business but at certain times had been used for the construction of additions and betterments to the taxpayer's property. In discussing the issue we stated (30 B.T.A. at 708):

On their respective briefs counsel for each of the parties argue that the only question here is whether the equipment was used in the petitioner's trade or business. Petitioner contends that it is a part of the regular business of a railroad to construct additional capital facilities for the transaction of its business as a common carrier. Counsel for respondent takes the opposite view, apparently upon the theory that depreciation is allowable only on account of wear and tear of assets used for producing income in a trade or business. This argument is not impressive, since it reads Congressional intent into a statute which is not apparent from the usual meaning of the words used therein. In the deficiency

notice the respondent states that the amounts in question are disallowed for the reason that such accounting is analogous to that made for transportation for investment-credit and cites *Great Northern Ry. Co.*, 8 B.T.A. 225, in which we said: "In our opinion, a part of the wear and tear of the train equipment of the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains." There is no citation of this case in respondent's brief, and apparently he no longer regards it as authority for the ruling now under review. In our opinion the equipment employed by the petitioner in its construction work was used by its owner in a trade or business. This satisfies the conditions of the statute.

In *Great Northern Railway Co.*, 8 B.T.A. 225 (1927), we had held that various expenses incurred by the taxpayer in connection with construction of additional facilities should be capitalized and considered as a part of the cost of the facilities constructed. In so holding we pointed out that one of the taxpayer's witnesses testified that in his opinion the operating expenses of the taxpayer would not have been reduced if men to do the construction work had not been carried on its passenger trains and construction materials had not been transported on certain of its freight trains since at the time the men and material were transported the trains were not running filled to capacity. We sustained respondent in his determination that an allocated portion of the various expenses should be capitalized and in so doing made the statement quoted in the opinion in *Great Northern Railway Co.*, 30 B.T.A. 691, 708 (1934). In our opinion all that was held in the second *Great Northern Railway Co.* case was that the depreciation which the taxpayer there sought to deduct was incurred in carrying on the trade or business of the taxpayer.

In the instant case the depreciation which was allocated to the leases here involved was with respect to machinery used in producing oil from those leases. It follows from the rule that depreciation on machinery used in a taxpayer's trade or business may be deducted in computing the income from that trade or business, that depreciation on machinery used in producing oil from specific leases should be considered as a production cost of the oil produced from those leases. We, therefore, conclude that depreciation as well as overhead should be considered as costs of production of the leases in determining petitioner's production costs of its various leases during the period required for the payout of the production payment.

This leaves us with two further questions. One of these questions is whether for the fiscal year ended March 31, 1963, in determining the amount to be considered as an additional cost of the Coleman, Paul, McCarty, Richards, and Watkins leases, the excess of costs over income should be determined for the first 7 months of the taxable year at which time the production payment was paid out or should be determined for the entire fiscal year.

Petitioner contends that income and expenses are considered on the basis of annual accounting periods in determining taxable income and that therefore the entire fiscal year should be considered for the purpose of determining the amount to be added by Katex to the cost of its interests in those leases. We do not agree that the conclusion petitioner reaches follows from the premises on which petitioner bases it. After the date the production payments are paid out, the amounts expended by petitioner to produce oil and gas from the leases are ordinary and necessary business expense in petitioner's trade or business of producing oil and gas. Therefore, petitioner's expenses after the time of the payout of the production payment are fully deductible whether the operation results in gain or loss to petitioner. We are concerned with the production expenses which are allocable to the oil produced from the Coleman, Paul, McCarty, Richards, and Watkins leases to pay out the production payment. After the first 7 months of the fiscal year 1963, that is after October 31, 1962, the production payment was paid out and only for the first 7 months of its fiscal year 1963 should any portion of the production costs of these leases be considered as a part of the cost of the interests acquired by Katex in the leases.

The final issue is whether the fracturing costs on the old wells which were on both groups of leases here in issue when Katex acquired its interests therein should be considered as a production expense or a development cost. Petitioner has, in accordance with section 263(c), I.R.C. 1954, and section 1.612–4(a), Income Tax Regs., elected the option to expense intangible drilling and development costs. In view of petitioner's selection of this option, respondent did not consider as a production cost of the leases here involved petitioner's expenses in drilling new wells. However, respondent did consider the fracturing costs of the existing wells to be a part of the production expenses of the leases here involved. Respondent does not contend that petitioner is not entitled to deduct the fracturing costs if those expenditures are development costs.

Petitioner points out that the cost of redrilling and deepening an oil well in order to put it on a basis of commercial production has long been considered to be a capital or development cost and not an ordinary and necessary business expense, citing *Consolidated Mutual Oil Co.*, 2 B.T.A. 1067 (1925). Petitioner then points out that we have considered expenses of shooting oil wells with nitroglycerin prior to the time the wells are placed in production to be a development expense, *P–M–K Petroleum Co.*, 24 B.T.A. 360 (1931), reversed pursuant to stipulation of parties 66 F. 2d 1009 (C.A. 8, 1933), and that increasing the depth of a well previously drilled has likewise been considered a capital or development expense. *Monrovia Oil Co.*, 28 B.T.A. 335, 347 (1933), affd. 83 F. 2d 417 (C.A. 9, 1936).

It is petitioner's position that the rock or sand fracturing of the wells here involved was comparable to the redrilling and deepening of wells or the fracturing of wells at the time they are drilled or before they are put into commercial production. In *Page Oil Co.*, 41 B.T.A. 952, 963 (1940), affd. 129 F. 2d 748 (C.A. 2, 1942), we viewed the drilling of water wells to stimulate or increase the production of an oil well to be an intangible drilling or development cost which must be recovered through depletion. Here, the testimony of petitioner's two expert witnesses shows that the rock- or sand-fracturing work done on the old wells was primarily to open up new zones of oil production that had not been previously producing.

While respondent argues that the record fails to show that there was not some production from all zones of the drilled-hole wells, we conclude from the evidence that there was certainly no substantial or commercial production from all zones of the drilled-hole wells prior to fracturing. The evidence tends to show that it was quite unlikely that there was any production at all from all zones of such wells prior to the time the zones were fractured. Certainly the fracturing of these wells was necessary to create any commercial production from certain zones. The cased wells had no production from the zone which Katex fractured prior to the fracturing.

Respondent relies on *James A. Lewis Engineering, Inc.* v. *Commissioner*, 339 F. 2d 706 (C.A. 5, 1954), affirming 39 T.C. 482 (1962), in support of his position. That case involved an interest in oil assigned to an engineering firm as compensation for services in connection with water-flooding existing producing wells. The taxpayer contended that if the services rendered were for "development," as distinguished from "production," the value of the oil it received from the assigned interest was not a part of its taxable income. The Fifth Circuit affirmed the holding of this Court that the services rendered were in connection with production. The facts in *James A. Lewis Engineering, Inc.* v. *Commissioner, supra*, distinguished that case from the instant case. Here, the fracturing of old wells which were currently producing in only very small quantities was done by the acquirer of the working interest in the leases in order to open up new areas of production from those wells. This is more nearly like deepening a well to bring in a new producing zone than water flooding to increase existing production.

In the context of the issue here under consideration, we conclude that the fracturing costs were in the nature of development costs and should be considered as development costs which petitioner is entitled to deduct.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

TANNENWALD, *J.*, concurring: I agree with the majority decision subject to my separate views as set forth in my concurring opinion filed in *L. W. and Jane Brooks*, also decided this day.

DAWSON and IRWIN, *JJ.*, agree with this concurring opinion.

----

FEATHERSTON, *J.*, dissenting: Having rejected the loss capitalization theory, I would enter decision for petitioner for the reasons stated in my dissent in *L. W. Brooks, Jr.*, 50 T.C. 927, decided this day.

FORRESTER and FAY, *JJ.*, agree with this dissent.